# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

BROCK FREDIN,

               Plaintiff,

--against--

ELIZABETH A. CLYSDALE,
DAVID E. MCCABE,
GRACE ELIZABETH MILLER,
CATHERINE MARIE SCHAEFER,
LINDSEY MIDDLECAMP

               Defendants.

Case No. 18-cv-510 JRT/BRT

**COMPLAINT**
Jury Trial Demanded



RECEIVED

FEB 22 2018

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

Plaintiff Brock Fredin ("Plaintiff"), proceeding *pro se*, hereby alleges the following against Defendant Elizabeth A. Clysdale ("Referee Clysdale"), David McCabe ("Sgt. McCabe"), Grace Elizabeth Miller ("Defendant Miller") and Catherine Marie Schaefer ("Defendant Schaefer"), and Lindsey Middlecamp ("City Attorney Middlecamp"), (collectively, "Defendants") in this action seeking prospective declaratory and injunctive relief as well as money damages:

## PRELIMINARY STATEMENT

1.     Plaintiff brings this action in an effort to once and for all cease what has become a two-and-a-half-year campaign of harassment, retaliation and outright discrimination against him by Defendants. The two people at the center of this campaign are none other than Minnesota's most infamous family court referee, Referee Elizabeth A. Clysdale and Twitter revenge platform owner turned Assistant City Attorney Lindsey Middlecamp, both of whom took unlawful actions against Plaintiff. Plaintiff need not describe their character as the words of Judge Judith Sheindlin capture these two individuals to a tee:

SCANNED

FEB 22 2018

U.S. DISTRICT COURT ST. PAUL

> I practiced before Family Court judges, many of whom are morons. And, they destroyed more lives than they helped. Many of them would come back from lunch drunk.[1] And, they were ruling on the lives of people who couldn't take care of themselves. Children who couldn't protect themselves.

(See https://www.youtube.com/watch?v=YbxHSobZPUQ at 13:25.) As set forth in this Complaint, Referee Clysdale and City Attorney Middlecamp have used their positions on the bench and within the City Attorney's Office to intentionally, deliberately and unconstitutionally inflict harm on Plaintiff (and countless other individuals) that has done nothing more than irreparably injure and destroy the life of Plaintiff and his family, who was at issue in the various proceedings.

2.      As this Complaint illustrates, throughout the *Miller v. Fredin, and (fraudulently piled-on) Schaefer v. Fredin, and (fraudulently piled-on) Middlecamp v. Fredin* litigation, Plaintiff was repeatedly subjected to some of the most outrageous, astonishing gender-bias, and flat-out unethical conduct by Referee Clysdale and City Attorney Middlecamp. Indeed, as a result of the corrupt acts of these two individuals, Plaintiff has been unconstitutionally striped of any meaningful involvement in his professional career, had his home raided by a terrifying no-knock swat team for legitimate criticism posted to his own Facebook and to unlawfully serve City Attorney Middlecamp's HRO and Defendant Schaefer's civil contempt motion, subject to unlawful enormous and continued financial burdens and even assaulted, falsely arrested/confined, and taunted by court officers at Referee Clysdale's direction, which has all

---

[1] Plaintiff can attest to this fact first hand. During the *Schaefer v. Fredin* and *Middlecamp v. Fredin* evidentiary trials discussed herein, Plaintiff was forced to sit before Referee Clysdale for upwards of five days. And, during calmer apparent stupors, Referee Clysdale would spend her time gazing at her computer trying to avoid eye-contact and rubber-stamping/auto-signing any document her clerks placed in front of her. During the more belligerent ones, the record demonstrates that Referee Clysdale endlessly screamed at and antagonized Plaintiff, invented facts, engaged in prejudicial hostile acts, pandered to Petitioners and their witnesses, and challenged Plaintiff to a legal altercation to get an "injunction" (under her breath) as proof of her pre-meditated rulings and rubber stamps.

been part of their pattern of retaliation and campaign to inflict harm on Plaintiff. What is most disturbing, however, is the way these two individuals have used their position on the bench and within the City Attorney's office to perpetuate their personal vendetta against Plaintiff by using their influence within the Minnesota Judicial Branch to have other individuals within the court system bring baseless and unconstitutional HRO proceedings, contempt proceedings and even criminal proceedings against Plaintiff in their attempts to harass and retaliate against Plaintiff for exercising his right to petition and his right to legitimately criticize their misconduct.

3.      Plaintiff brings this action for two primary purposes. First, Plaintiff seeks to redress the two-and-a-half-year campaign of harassment, terror and retaliation against Plaintiff. As set forth in this Complaint, Referee Clysdale and City Attorney Middlecamp have waged an unending war against Plaintiff with the intent to inflict immeasurable harm on him in retaliation for Plaintiff's legitimate exercise of his rights to free speech and his right to petition the government for redress with respect to their misconduct and tortious actions. In order to accomplish their goal, Referee Clysdale and City Attorney Middlecamp have engaged in acts, largely by and through her position as presiding judicial officer in *Miller v. Fredin, Schaefer v. Fredin, and Middlecamp v. Fredin*, specifically designed to thwart Plaintiff's right to meaningful access to the courts. This campaign of terror must cease and Referee Clysdale and City Attorney Middlecamp must be held accountable for their unlawful and unethical actions. More importantly, the apparent cover-up of Referee Clysdale and City Attorney Middlecamp's unlawful and unethical actions directed at Plaintiff (and numerous other litigants) perpetuated throughout the Minnesota Judicial Branch as detailed in this Complaint must be brought to light and ended permanently.

4.       Second, and most important, Plaintiff brings this action to put an end to blatantly retaliatory and demonstrably bad faith collateral pile-on Prior Restraint harassment restraining orders ("HRO") matter instigated by Referee Clysdale and City Attorney Middlecamp. Since the day Referee Clysdale took the bench in *Miller v. Fredin, Schaefer v. Fredin, and Middlecamp v. Fredin*, it is apparent that she only had one goal in mind:  to ensure that Plaintiff was criminalized in retaliation for Plaintiff exercising his legitimate First Amendment rights to criticize both Referee James Street and herself and as litigation went on City Attorney Middlecamp, Defendant Miller, or Defendant Schaefer *et al*.  In furtherance of this goal, City Attorney Middlecamp denied Plaintiff critical evidence at the *Schaefer v. Fredin* trial and *Middlecamp v. Fredin* trial that was necessary to defend himself, engaged in patently abusive conduct towards Plaintiff throughout the trial(s) in an effort to goad Plaintiff, tortuously stripped Plaintiff of the financial means to defend himself less than two months prior to the start of the *Middlecamp v. Fredin* and State of Minnesota v. Fredin trial(s) by personally disseminating false and disparaging information to the press and deliberately subjecting Plaintiff to improper and completely false disparaging pretrial publicly.  As part of that publicity, City Attorney Middlecamp unconstitutionally and without Plaintiff so much as speaking a word to her questioned Plaintiff's fitness to practice his career, date, marry, or have a family where she unlawfully published over fifty (50) times on her Twitter revenge porn platform entitled @CardsAgstHrsmt and improperly disseminated to the media.  Moreover, in furtherance of this effort to destroy Plaintiff, Referee Clysdale demonstrably fabricated adverse findings against Plaintiff in her *Schaefer v. Fredin* Order and *Middlecamp v. Fredin* decisions tailor made for collateral pile-on proceedings and Prior Restraint.  *See Near v. Minnesota*, 283 U.S. 697 (1931)

4

("the immunity of the press from prior restraint … a more serious evil would result if officials could determine which stories can be published …").

5.      Shortly after awarding the fraudulent collateral pile-on HRO for City Attorney Middlecamp's personal friend, Defendant Schaefer, in *Schaefer v. Fredin*, City Attorney Middlecamp urged the Saint Paul City Attorney's office to bring extraordinary Prior Restraint and criminal proceedings against Plaintiff based solely on Referee Clysdale fabricated Order in her November 17th, 2016th Decision in *Schaefer v. Fredin*.[2]  As a result of the application of collateral estoppel inherit in special trials under Minnesota law, Plaintiff could not contest Referee Clysdale Order, present evidence in his defense or even have a hearing to determine whether Plaintiff purported conduct (asking her to remove revenge porn ads she published impersonating his identity) constituted acts of harassment.  And, to make matters worse, the record conclusively demonstrates that Plaintiff had no notice and was denied any meaningful opportunity at the *Schaefer v. Fredin* trial to defend against Defendant Schaefer's fabricated allegations.   Here, City Attorney Middlecamp solicited her personal friend, Defendant Schaefer, to make these false allegations against him to track, stalk and manufacture a media campaign and dove tail them within Defendant Miller's case before the Minnesota Court of Appeals.   In an effort to obtain his attention for purposes of filing her fraudulent collateral pile-on HRO, Defendant Schaefer, City Attorney Middlecamp, and Defendant Miller published adult ads impersonating his identity that sent countless emails to his personal email address in violation of the newly enacted revenge porn law.  Despite the fact that City Attorney Middlecamp, Defendant Schaefer, and Defendant Miller know and have tacitly acknowledged that they are aware that

---

[2] Plaintiff had never met, spoken to, or had any meaningful interaction with Defendant Schaefer beyond a failed blind-date in which he stood her up in March 2014.  In her outrageous and terrifying efforts to stalk Plaintiff, Defendant Schaefer would later invent irrefutably false police reports to conceal her misconduct.  After subpoenas were resolved, each claim originated from telemarketers and were not connected to the Plaintiff.

both Defendant Schaefer's allegations and Referee Clysdale Orders were fabricated and completely contrary to the results of subpoenas ultimately pulled by the Saint Paul Police department in *Schaefer v. Fredin*, they have continued to pursue criminal charges, Plaintiff's life destruction, media smear campaigns, and vindictive prosecution in the various bogus criminal investigations despite their duty under Rule 3.8 of the Rules of Professional Conduct requiring that they withdraw the assertions of misconduct that they know to be unfounded.

6.    When City Attorney Middlecamp finally petitioned for her own farcical collateral pile-on HRO on April 14th, 2017, claiming that Plaintiff's legitimate criticism of her conduct on his own Facebook amounted to "threats", and were indeed acts of harassment, the Plaintiff was suddenly attacked militarily by a no-knock swat team entry, falsely arrested/imprisoned, and had all of his digital assets and computers seized for forensic examination.[3]  According to her petition, after City Attorney Middlecamp began orchestrating a *City Pages* tabloid, over fifty (50) tweets to thousands of people, countless false police reports, and pile-on HRO's, she claimed the text "Sadly, Lindsey Middlecamp is still a licensed attorney in the State of Minnesota" in a single public April 4th, 2017 Facebook post somehow invaded her personal sense of security and privacy.  Defendants all-out attack on the truth is demonstrably evidenced by this single event.  As a matter of law, City Attorney Middlecamp has no right to engage in patently offensive tactics by using her law license and public position to initiate unlawful and terrorizing military style raids ("Swat Raid") to bully and censor people whom she dislikes.

7.    Shortly after the Swat Raid, Plaintiff was forced to attend even more farcical kangaroo Court hearings in *Middlecamp v. Fredin* before Referee Clysdale.  Instead of reviewing

---

[3] After forensic examination, Each and every one of Plaintiff's computers and digital assets were verified to have no unlawful content. Sgt. McCabe curiously returned all the seized items from his unlawful search warrant a day before the Amended Complaint was due (August 2017) in *Fredin v. Middlecamp* Case No: 17-cv-3058.

the facts of City Attorney Middlecamp's outrageous, incredible, and egregious unlawful misconduct, Referee Clysdale sought to cover-up and conceal these acts by focusing on the single legitimate First Amendment protected Facebook post authored by the Plaintiff. And, again, Plaintiff was denied any opportunity to enter evidence, obtain continuances, ascertain the facts of the case through discovery, and had all his pre-trial motions summarily denied without forcing written opposition. Even worse, City Attorney Middlecamp retaliated against Plaintiff's counsel forcing his withdraw.[4] Among the virtually endless acts of attorney misconduct by City Attorney Middlecamp, one stands out: she ultimately failed to make proper pre-trial disclosures by sharing the results of critical subpoena evidence. In an effort to insulate her previous fabricated Order in *Schaefer v. Fredin* and the resulting false media coverage, Referee Clysdale once again fabricated an Order from a woman that had never met, spoken to, or had any interaction whatsoever with Plaintiff. Furthermore, in her fabricated findings, she issued the most draconian and cruel Prior Restraint Order unconstitutionally depriving Plaintiff the right to criticize or even publicly speak about City Attorney Middlecamp in hopes to trap the Plaintiff with the Collateral Bar rule.[5] As a result of the application of Prior Restraint, Plaintiff could not contest Referee Clysdale findings publicly, present evidence in his defense or even describe the virtually unlimited acts of misconduct perpetuated by Referee Clysdale or City Attorney Middlecamp. And, to make matters worse, the record conclusively demonstrates that City Attorney Middlecamp, Defendant Schaefer, Defendant Miller and Referee Clysdale fabricated Orders based on irrefutably false and contrived claims. Indeed, as set forth in this Complaint, the

---

[4] Plaintiff's then-counsel, Barry S. Edwards, withdrew after the Saint Paul City Attorney's Office Threatened his "twenty or so other cases" in St. Paul. Mr. Edwards is facing suspension from the Minnesota Professional Responsibility Board.

[5] Indeed, the Collateral Bar Rule was mostly recognized in *Walker v. City of Birmingham* to unlawfully limit Dr. Martin Luther King, Jr from espousing Civil Rights through peaceful protests.

Prior Restraint Order initiated by Referee Clysdale and City Attorney Middlecamp, Defendant

Schaefer, and Defendant Miller were brought and are being maintained in demonstrably bad faith

and as part of a pattern of retaliation and harassment against Plaintiff demonstrably orchestrated

and instigated by Referee Clysdale and City Attorney Middlecamp during an unlawful

conspiracy with Defendants.

8.      As a result, Plaintiff seeks prospective declaratory and injunctive relief to enjoin

Defendants' continued unconstitutional, harassing and retaliatory acts against Plaintiff

inconsistent with Due Process against Plaintiff.  This includes prospective declaratory and

injunctive relief declaring the Prior Restraint Proceedings and Order brought by City Attorney

Middlecamp, Defendant Schaefer, Defendant Miller, and/or retaliatory Swat Raids by Sgt. David

McCabe against Plaintiff based solely on Referee Clysdale's decision in *Miller v. Fredin,*

*Schaefer v. Fredin*, and *Middlecamp v. Fredin* unconstitutional as inconsistent with Due Process.

Furthermore, Plaintiff seeks compensatory damages against Defendants for their unlawful and

unconstitutional acts and conduct, as specified in the Complaint, that have caused Plaintiff

immeasurable harm and injury.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over Plaintiff's claims against Referee

Clysdale, City Attorney Middlecamp, and Sgt. McCabe pursuant to 28 U.S.C. §§ 1331 and

1343(3) and (4) as this matter involves a federal question seeking redress for violations of

Plaintiff Brock Fredin's constitutional and civil rights.

10.     Plaintiff's claims for prospective declaratory and injunctive relief are authorized

by 28 U.S.C. §§ 2201 and 2201 as well as Rule 57 of the Federal Rules of Civil Procedure.

11.     This Court has subject matter over Plaintiff's claims of false arrest/imprisonment, abuse of process, intentional infliction of emotional distress, conspiracy, and fraud against Referee Clysdale, City Attorney Middlecamp, Defendant Schaefer, Defendant Miller and Sgt. McCabe pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. This Court also has supplemental jurisdiction over Plaintiff's claims against City Attorney Middlecamp pursuant to 28 U.S.C. § 1367(a) as the claims are so related to those claims with original jurisdiction in this Court that they form part of the same case or controversy.

12.     Venue is proper in the United States District Court for Minnesota pursuant to 28 U.S.C. § 1391(B) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this Judicial District.

13.     The Court also has federal question jurisdiction under 28 U.S.C. § 1331.

14.     Venue is proper pursuant to 28 U.S.C. § 1332(b)(1) and (b)(2) because the events that gave rise to this action occurred in this Judicial District.

## THE PARTIES

15.     Plaintiff Brock Fredin is a citizen of the State of Wisconsin and resides at an address of 1905 Iris Bay, Hudson, WI 54016. Plaintiff is the respondent in *Miller v. Fredin Case No: 62-HR-CV-16-46*, *Schaefer v. Fredin Case No: 62-HR-CV-16-411*, and *Middlecamp v. Fredin Case No: 62-HR-CV-17-233*. Plaintiff was the appellant in *Miller v. Fredin* Case No: A16-0613. Plaintiff is the Defendant in *State of Minnesota v. Brock Fredin* Case No: 62-CR-17-3156 and *State of Minnesota v. Brock Fredin* Case No: 62-CR-18-157.

16.     Referee Clysdale is employed as a Judicial Officer and Referee for the Ramsey County District Court within the Minnesota Judicial Branch. Referee Clysdale was the presiding

judicial officer *in Schaefer v. Fredin and Middlecamp v. Fredin* pending in Ramsey County
District Court. Referee Clysdale was also the signing authority in the *Miller v. Fredin* temporary
ex-parte HRO. Upon information and belief, Referee Clysdale maintains a professional address
of 25 E 7th, Street, Saint Paul, Minnesota 55102. Plaintiff brings this action against Referee
Clysdale in her official and individual capacity.

17.     City Attorney Middlecamp is employed as an Assistant City Attorney for the City
of Minneapolis. Upon information and belief, City Attorney Middlecamp used City of
Minneapolis Attorney Office resources to communicate regarding Plaintiff Brock Fredin. Upon
information and belief, shortly after City Attorney Middlecamp began using City resources to
communicate regarding Plaintiff Brock Fredin, Plaintiff's house was raided by a swat team to
benefit the @CardsAgstHrsmt media platform. City Attorney Middlecamp admitted on-the-
record to communicating with Sgt. McCabe prior to the raid using City of Minneapolis
resources. Upon information and belief, City Attorney Middlecamp maintains a professional
address of 350 S 5th Street, Minneapolis, Minnesota 55415. Upon information and belief, City
Attorney Middlecamp is a citizen of the State of Minnesota and resides at an address of 2110
Aldrich Avenue S., Minneapolis, MN 55405. Plaintiff brings this action against City Attorney
Middlecamp in her official and individual capacity.

18.     Upon information and belief, Defendant Grace Elizabeth Miller is a citizen of the
State of Minnesota and resides at an address of 1656 Dayton Ave S., Saint Paul, MN 55104.
Plaintiff brings this action against Defendant Miller in her individual capacity.

19.     Upon information and belief, Defendant Catherine Marie Schaefer Miller is a
citizen of the State of Pennsylvania and resides at an address of 120 W Cherry Ln., State

College, PA 16803. Plaintiff brings this action against Defendant Schaefer in her individual capacity.

20.     Sgt. McCabe is employed as a police officer for the Saint Paul Police department within the state of Minnesota. Sgt. McCabe has been the presiding detective in the matters *Miller v. Fredin* and *Schaefer v. Fredin*. Additionally, Sgt. McCabe manufactured an unlawful search warrant to serve City Attorney Middlecamp's Prior Restraint HRO and Defendant Schaefer's Prior Restraint contempt motion during a no-knock swat raid of Plaintiff Brock Fredin's personal home at 1905 Iris Bay, Hudson, WI 54016. Furthermore, Sgt. McCabe knowingly and deliberately failed to disclose the reason for his unlawful search warrant delivered to Hudson, Wisconsin and St. Croix County authorities on the search warrant affidavit before Hon. Judge Michael Waterman filed in St. Croix County, Wisconsin and unlawfully seized all of Plaintiff's digital assets to retaliate over legitimate First Amendment criticism posted on his own Facebook. Upon information and belief, Sgt. McCabe maintains a professional address of 367 Grove Street, Saint Paul, MN 55101. Plaintiff brings this action against Sgt. McCabe in his official and individual capacity.

## STATEMENT OF RELEVANT FACTS

### I.     BACKGROUND

21.     The genesis of the instant matter stems from Plaintiff's breakup from Defendant Miller in January 2016. Plaintiff and Defendant Miller dated for the latter half of 2015. In October 2015, Defendant Miller learned (now known to be irrefutably false) claims brought maliciously from Defendant Schafer in an attempt to harass and stalk the Plaintiff. After being alarmed by these claims, Defendant Miller filed for a temporary ex-parte HRO in Ramsey County on January 28th, 2016.

22.     Just before filing, however, Defendant Miller and Plaintiff had a petty but nonetheless innocent argument where Plaintiff posted an apology merely minutes thereafter to a social media account captioned "To a lost love.  Incredibly sorry Grace."  In a series of revenge acts concocted by Defendant Miller to retaliate over this failed relationship, she has falsely characterized this brief legitimate First Amendment post as both "threatening" and an HRO violation.  This post is available online as described below.[6]  Even after obtaining her ex-parte HRO, Defendant Miller failed to cease obsessively contacting Plaintiff.  Instead, she repeatedly emailed him aggressive taunts in-line with her role as an aggressive and elite United States Air Force officer.  As a result, Plaintiff was forced to suffer through virtually endless direct taunts illustrative of Defendant Miller's volatile personality.  For example, Defendant Miller claimed, "I was one-hundred percent [expletive] serious."  In what would become her two-year vindictive prosecution to destroy Plaintiff's life.  (See Ex. 10.)

23.     Given the statements in her January 28th, 2016 HRO petition that she said, "do not contact me" (which Plaintiff followed) during a petty argument yet Defendant Miller sent repeated unprompted emails over the course of a week thereafter which were ignored by the Plaintiff it remains ironic that Plaintiff was immediately seen unfavorably by the Court.  And, this was not the first time Defendant Miller had played this game.  Plaintiff, himself, during a petty argument week prior told her "stop talking to me."  Like most relationships, the two parties found common ground and continued communication.

24.     Plaintiff has been vilified in the media and reported as a "stalker" and a "harasser" for making this post illustrative of his reasonable and responsible concerns for Defendant Miller's emotional well-being following the argument.  In order to falsely characterize this as an

---

[6] See e.g., https://drive.google.com/open?id=1njm7fbiIdQG0lxdr0VtTlLwZBrRCGRo1

HRO violation, Defendant Miller began obsessively clicking on the social media profile to generate a "recent profile views" blurb within her main dashboard. In effect, Defendant Miller took affirmative steps to either view and/or send herself a message based on Plaintiff's legitimate First Amendment post. Moreover, the post was originally generated prior the existence of the ex-parte HRO.

25.     Defendant Miller is a Major in the United States Air Force and commands the Aircraft Maintenance Squadron at the 934th Airlift Wing for the Minneapolis-St. Paul Air Reserve Station. In addition to numerous other graduate degrees, she just finished her PhD in English Literature at the University of Minnesota. Her only job prior was working at the United States Air Force Academy as an English instructor where she mentored Rhode Scholar students including Rebecca Esselstein. In doing so, Defendant Miller attempted to date Ms. Esselstein's brother only to mock him relentlessly – as she has done to virtually any man she comes into contact with - for traveling from Ohio for a date.

26.     During the March 21st, 2016 trial in *Miller v. Fredin*, Plaintiff (blind to Defendant Schaefer's stalking and previous contact with Defendant Miller) nonetheless detailed the petty argument and Defendant Miller's persistent emails even after obtaining her ex-parte Order. In effect, Plaintiff argued that Defendant Miller was using the ex-parte legal proceeding illegitimately to limit Plaintiff's free speech. Referee James Street ignored any common-sense argument and made comments on-the-record that would be the start of Prior Restraint. Referee Street claimed that Facebook posts to "vent" were only meant for "friends and family" and should not be posted.[7] As a result, Defendant Miller was awarded a two (2) year HRO and the seeds of Prior Restraint were planted.

---

[7] Sgt. McCabe would cite Referee Street's comments in his illegitimate Search Warrant Affidavit. In effect, Sgt. McCabe tried to twist his words into Prior Restraint and the legal basis for obtaining a search warrant.

27.     Shortly after, Plaintiff appealed the HRO to the Minnesota Court of Appeals. Plaintiff held that Defendant Miller's repeated contacts (trying to get him to remove his dating profiles) even after obtaining her ex-parte HRO invalidated her "harassment" and/or stalking claims. Additionally, Plaintiff held that his apology was legitimate First Amendment speech. Instead, Plaintiff's counsel, Nathan Hansen, deliberately attempted to file Plaintiff's appellate brief without first reviewing all the facts and consulting with the Plaintiff. In effect, citing the pervasive gender-bias throughout family court proceedings and the Court's hesitation to review any adverse findings against women.

II.     **PURSUIT OF BAD FAITH COLLATERAL PILE-ON HARASSMENT RESTRAINING ORDERS**

28.     In June 2016, during the *Miller v. Fredin* Appellate process, Defendant Miller sought to retaliate even further against the Plaintiff by soliciting City Attorney Middlecamp and Defendant Schaefer to manufacture allegations and petition for an additional HRO to authenticate a false media smear campaign.[8]  In order to do this, however, they needed to justify their concocted scheme by soliciting his response. As a result, City Attorney Middlecamp, Defendant Schaefer, and Defendant Miller created outrageous knowingly defamatory content by creating ads impersonating his identity on adult websites which sent countless emails to his personal email in violation of the newly enacted Minnesota revenge porn law. After a week-long skip-tracing event, Plaintiff found that Defendant Schaefer not only had created the defamatory content but was connected to a past anonymous blind-date in which he stood her up in March 2014. Plaintiff sent one email respectfully requesting that she cease her actions. Instead, Defendant Schaefer falsely claimed this email was "stalking" and petitioned for an HRO against

---

[8] See e.g., http://reason.com/archives/2017/12/27/metoo-is-turning-into-a-witch-hunt; See e.g., https://www.psychologytoday.com/blog/laugh-cry-live/201801/has-the-metoo-movement-gone-overboard-aziz-ansari

Plaintiff in further efforts to conceal her misconduct, retaliate and restrict Plaintiff via Prior

Restraint.  And, again, Plaintiff had never met, spoken to, or had any meaningful interaction with

Defendant Schaefer beyond the failed anonymous blind-date.  Likewise, Plaintiff had no

interaction whatsoever with City Attorney Middlecamp prior to her legal action.  Moreover, it

was later found that Defendant Schaefer's friend (City Attorney Middlecamp) and husband

David Middlecamp conveniently ran the revenge porn platform @CardsAgstHrsmt which

publishes sordid and outrageous photos of men naked or semi-naked to "shame" them for the

remainder of their life.   It was clear, the previous adult ads published to impersonate the Plaintiff

were directly related to City Attorney Middlecamp's tactics and media platform.  Moreover,

Defendant Schaefer and City Attorney Middlecamp are connected on social media.

29.     Furthermore, Plaintiff had been made aware of these vicious smear campaigns to

invade his safety, security, and privacy and sought to prevent this through filing his own HRO

against Defendant Schaefer in August 2017.  Instead, Referee Clysdale negligently deliberately

failed to offer proper protection and even ignored any evidence that very obviously illustrated

these facts.  Rather, Referee Clysdale in her relentless gender-bias would only review allegations

*from* women.  Indeed, the County receives a grant for each restraining order pursuant to the

Violence Against Women Act ("VAWA").  As a result, Referee Clysdale has a financial

incentive to rubber-stamp any allegation from women to receive federal funding to raise salaries,

bonuses, and gain funding for Ramsey county.

30.     On September 20th, 2016, Defendant Miller attempted to both initiate and cancel

multiple show cause hearings over Facebook posts which did not violate any known state statute,

federal law, and posed no opportunity for violating her HRO.  Plaintiff's attorney Nathan

Hansen responded with "Eric looked through Brock's fb and didn't see anything that mentioned."

15

(*See* N. H. Email Sep. 20th, 2016.) This is the start of Defendant Miller abusing process by pursuing a number of outrageous and vicious options to impose Prior Restraint on her ex-boyfriend.

31.    Moreover, the record in *Miller v. Fredin or Schaefer v. Fredin* makes clear that each time Plaintiff exercised or invoked a legal right to force a hearing on the issue of court-imposed prior restraint of his speech, Referee Clysdale hit back with a convoluted and/or unlawful way to thwart Plaintiff's legal maneuvers and delay a legitimate resolution of the case.

   A.    The November 17th, 2016 Schaefer v. Fredin Trial

32.    As explained below, Referee Clysdale repeatedly denied Plaintiff a legitimate and fair opportunity to litigate or contest the fraudulent HRO that she imposed without a hearing or fact-finding, to which Plaintiff had an absolute right, in an effort to prolong the matter at the expense of Plaintiff. All the while, she allowed the attorneys and court-appointed actors to exploit the case and churn enormous court-encouraged fees on Plaintiff. This included Plaintiff's counsel *Nathan Hansen* (approx. $12,000 for one week of work. These astronomical fees continue to mount on Plaintiff without relief from the court and to the clear detriment of his family and mother.

33.    As mentioned above, Defendant Schaefer made knowingly deliberately false statements to investigators in an effort to instigate criminal charges against Plaintiff and to impose Prior Restraint preventing him from exercising legitimate First Amendment speech.

| Primary Reporting Officer: Mccabe, David E | Name of location/business: |
|---|---|
| Primary squad. | Location of incident: 1180 GRAND AV Apt 2 |
| Secondary reporting officer | ST PAUL, MN 55105 |
| Approver | |
| District: Western | Date & time of occurrence, 11/15/2016 00:23 00 to |
| Site, | 12/10/2016 10:21 00 |

Arrest made.
Secondary offense.

---

Police Officer Assaulted or Injured:                    Police Officer Assisted Suicide.
Crime Scene Processed:

## NARRATIVE

On 01/02/2017, I (Sgt McCabe, SPPD Sex Crimes) received an email from the victim of this incident, reporting that she received a message from an unknown person and suspect it may be FREDIN  In the message the sender (763-515-4376) tries to initiate contact with the victim, claiming to be a friend "from online, a long time ago "  The victim requested that the sender send a picture, and they sent a picture the victim did not recognize  The victim was also advised to contact her local PD

This information was initially screened by the SPCA, but because there is no specific content in the message suggesting that FREDIN was the sender, it was deemed insufficient as evidence for a single violation, however, in totality of this situation, efforts are being made to identify the sender's location and identity (if known)

On 03/30/2017, a subpoena was sent to Onvoy, LLC (legal@onvoy com), requesting customer information for #763-515-4376

## PUBLIC NARRATIVE

---

| | Location of incident: 1180 GRAND AV Apt 2 |
|---|---|
| Primary squad. | ST PAUL, MN 55105 |
| Secondary reporting officer | |
| Approver | |
| District: Western | Date & time of occurrence. 11/15/2016 00:23 00 to |
| Site. | 12/10/2016 10:21 00 |

Arrest made.
Secondary offense.

---

Police Officer Assaulted or Injured:                    Police Officer Assisted Suicide.
Crime Scene Processed:

## NARRATIVE

On 03/31/2017, I received a response to an administrative subpoena served to Onvoy, LLC (via Email), that provided the Whole saler information to [763-515-4376] as, Text Plus, INC

On 4/6/2017, I served an administrative subpoena on TextPlus, INC (via email), for subscriber information for [763-515-4376], and on 04/13/2017 received data back from that request. That data was added to the SPPD Media Vault.

That data showed, that on 01/02/2017 @ 1428 (GMT), the [IP Address 74 44 215 189] (which shows that it is owned and operated from Frontier Communications), was being used at that time

On 04/17/2017, I served an administrative subpoena on Frontier (via Corporation Service Company, Christine Olund), for subscriber information and address of [IP Address 74 44 215 189]  On 04/18/2017, I received a response from Frontier with the following subscriber information, Twin City Steel Erectors INC (13065 132nd ST W, Apple Valley, MN, 952-423-6101)

At this time there is no known connection between Brock FREDIN and that company

List of Files for CN 16253015

1  16253015-04162017_234616-STALKING(1111550_NextPlus_Activity) csv - TextPlus Activity
2  16253015-04132017_105934-STALKING(prov1xbc@gmail com_VoiceCalls) csv - TextPlus Calls

The labeled photos were TRANSFERRED to the Media Vault.

List of Photos for CN 16253015

1  16253015-04162017_113714-STALKING(Frontier AS Return) pdf - Frontier AS Return

SP00980035C-133734

Saint Paul Police Department

# SUPPLEMENTAL OFFENSE / INCIDENT REPORT

Complaint Number   Reference CN                                           Date and Time of Re

**16122823**                                                             03/30/2017 08:

Primary offense

## HARASSMENT-STALKING LAW VIOLATION

Primary Reporting Officer  Mccabe, David D          Name of Establishment/Business

Primary squad                                        Location of incident  1100 GRAND AV Apt 2

Secondary reporting officer                                              ST PAUL, MN 55104

Approver

District  Central                                    Date & time of occurrence  01/01/2014 11 48 00 to

Site                                                                     06/20/2016 11 48 00

Arrest made:

Secondary offense

Police Officer Assaulted or Injured        Police Officer Assisted Squads
Crime Scene Processed:

## NARRATIVE

On 07/01/2016, the victim of this incident reported that she had two "odd" calls in the same night. The following are the reported numbers and what was found on them:

619-300-7004; Lists to a Patrick Oshea, as a utility (through Cingular wireless), out of San Diego CA (and has since 2011). An internet search also revealed this number as a possible telemarketer

209-201-1847; Lists to a business (Pac-West Telecom, INC), out of Stockton CA, an internet search also revealed this number as a possible telemarketer.

Saint Paul Police Department

# SUPPLEMENTAL OFFENSE / INCIDENT REPORT

Date and Time of Report
04/18/2017

Complaint Number    Reference CN
**16253015**

Primary offense
**HARASSMENT-STALKING LAW VIOLATION**

Name of Location/Business:
Location of Incident: **1180 GRAND AV Apt 2**
**ST PAUL, MN 55105**

Primary Reporting Officer:  Mccabe, David E
Primary squad:
Secondary reporting officer:

Approval:
Chase, Western
Site:

Date & time of occurrence: **11/15/2016 00:23:00 to**
**12/10/2016 10:21:00**

Area of crime:
Secondary offense:

Police Officer Assaulted or Injured:            Police Officer Assisted Suicide:
Crime Scene Processed:

## NARRATIVE

On 03/31/2017, I received a response to an administrative subpoena served to Onvoy, LLC (via Email), Itz provided the Whole saler information for [763-515-4376] as; Text Plus, INC.

On 4/6/2017, I served an administrative subpoena on TextPlus, INC. (via email), for subscriber information for [763-515-4376], and on 04/13/2017 received data back from that request. That data was added to the SPPD Media Vault.

That data showed, that on 01/02/2017 @ 1428 (GMT), the [IP Address 74.44.215.189] (which shows that it's owned and operated from Frontier Communications), was being used at that time.

On 04/17/2017, I served an administrative subpoena on Frontier (via Corporation Service Company, Christine Olund), for subscriber information and address of [IP Address 74.44.215.189]. On 04/18/2017, I received a response from Frontier with the following subscriber information; Twin City Steel Erectors INC (13065 132nd ST W, Apple Valley, MN, 952-423-6101).

At this time there is no known connection between Brock FREDIN and that company.

List of Files for CN 16253015.

  1. 16253015-04162017_234616-STALKING(1111550_NextPlus_Activity).csv - TextPlus Activity
  2. 16253015-04132017_105934-STALKING(prov1xbc@gmail.com_VoiceCalls).csv - TextPlus Calls

The labeled photos were TRANSFERRED to the Media Vault.

List of Photos for CN 16253015

  1. 16253015-04182017_113714-STALKING(Frontier AS Return).pdf - Frontier AS Return

Saint Paul Police Department

**SUPPLEMENTAL OFFENSE / INCIDENT REPORT**

Complaint Number   Reference CN                              Date and Time of Re

16122823                                                      05/02/2017 18:

Primary offense:

HARASSMENT-STALKING LAW VIOLATION

Primary Reporting Officer: Mccabe, David E          Name of location/business:
Primary squad:                                      Location of incident: 1180 GRAND AV Apt 2
Secondary reporting officer:                                   ST PAUL, MN 55104
Approver:
District: Central                    Date & time of occurrence: 01/01/2014 11:48:00 to
Site:                                                  05/20/2016 11:48:00

Arrest made:
Secondary offense:

Police Officer Assaulted or Injured:          Police Officer Assisted Suicide:
Crime Scene Processed:

**NARRATIVE**

On 05/02/2017, I (Sgt McCabe, SPPD), received the following information from a subpoena served on Google Voice at the request of the SPCA.

List of Files for CN 16122823:

1. 16122823-05012017_053154-STALKING(8125640343.Golflow4@gmail.com.Voice).txt  -  Google Voice Return for 6125640343
2. 16122823-05012017_053154-STALKING(8125640343.VHarma@mypanthers.org.Voice).txt  -  Google Voice Return for 8125640343
3. 16122823-05012017_053154-STALKING(9522228094.Golflow4@gmail.com.Voice).txt  -  Google Voice Return for 9522228094
4. 16122823-05012017_053154-STALKING(Letter 991052).pdf  -  Google Voice Letter

The labeled photos were TRANSFERRED to the Media Vault.

None of the results obviously directly connect to FREDIN.

**PUBLIC NARRATIVE**

Last page of the report

(*See* SPPD Case No: 16122823 Case No:16253015.)

34.     Moreover, the record in *Schaefer v. Fredin* makes clear that each time Plaintiff

exercised or invoked a legal right to force a hearing on the issue of court-imposed prior restraint

of his speech, Referee Clysdale hit back with a convoluted and/or unlawful way to thwart

Plaintiff's legal maneuvers and delay a legitimate resolution of the case.

35.     Referee Clysdale's actions and orders were extremely troubling and prejudicial to

Plaintiff.  As an initial matter, Referee Clysdale denied Plaintiff a full and fair hearing by

allowing Defendant Schaefer to make any farcical allegation and admit any hearsay evidence

desired including police reports and anonymous random dating profile messages she claimed to

have received.  As a result, Referee Clysdale could not determine that the dating messages were

from an anonymous dating website where Defendant Schaefer's identity could never be

discerned.  Moreover, Referee Clysdale imposed the most draconian form of Order by failing to

realize the parties had never met, spoken, and Defendant Schaefer was the only witness.  The

entire trial was merely an opportunity for Defendant Schaefer to outrageously humiliate and

"dox" the Plaintiff by attempting to file photographs of him with his family.  Of course, Referee

Clysdale failed to prevent these unethical activities.  Furthermore, Referee Clysdale failed to

read the only critical piece of email detailing Defendant Schaefer's outrageous and unlawful

revenge porn law violations that would later be authenticated via @CardsAgstHrsmt.

     36.     Lastly, Referee Clysdale's imposition of a HRO while directing Plaintiff to bear

the full cost of litigation was improper and inconsistent with Due Process.  In imposing the

financial burden on Plaintiff, Referee Clysdale conducted no inquiry or hearing to determine

whether Peter Mayer was providing free legal service to collaterally attack Plaintiff through City

Attorney Middlecamp.  Moreover, the entire proceeding lasted fifteen (15) or twenty (20)

minutes and was simply another Drumhead proceeding conducted to rubber stamp Referee

Clysdale's premeditated HRO.

    III.    <u>PUBLISHING AN INTENTIONALLY DISPARAGING AND IRREPARABLY
STIGMATIZING DECISION BY JUDGE KEVIN G. ROSS TO INCITE
OUTRAGEOUS KNOWINGLY AND IRREFUTABLY FALSE
ALLEGATIONS</u>

     37.     On June 27th, 2016, four (4) days before a calendared appellate brief deadline,

Defendant Miller demanded a hearing to require her HRO be modified to bar the Plaintiff from

making any Facebook posts or speaking about her publicly.  In doing so, Defendant Miller

radically changed and expanded her allegations of harassment.  In this petition, she falsely

alleged that virtually any Facebook or social media post or profile somehow was directed at her

(despite the fact they were not direct messages and did not tag or notify her) and therefore violated the HRO.   Defendant Miller's allegations not only necessarily conflicted with her prior sworn allegations without any explanation or reasoning but were substantially embellished and added-to from her two prior sworn statements.  As a result of Defendant Miller's filing of a new petition for a temporary HRO requesting that his speech be censored in the Family Justice Center of the Ramsey County District Court just days prior to the commencement of a *Miller v. Fredin* appellate brief deadline before the Minnesota Court of Appeals, the range of harassment allegations were being expanded to include any known speech ever uttered by the Plaintiff – including private text messages exchanged during his routine relationship with Defendant Miller well before the HRO.  Indeed, Defendant Miller's tactical filing that radically changed her allegations of harassment just days before the calendared *appellate brief deadline* on July 1st, 2016 left Plaintiff fundamentally unprepared to defend himself against her allegations.  On advice of counsel, Plaintiff agreed to enter into a verbal agreement with Ms. McQuitty providing for a limited period of social media profile removal, where Defendant Miller demanded that he stop posting while she was deployed to Kuwait as part of the agreement.  Plaintiff's counsel believed that without the additional time to gather evidence and witnesses to defend against Defendant Miller's radically changed and new allegations of harassment dropped on him two hours before the emergency *TRO* filing on June 27th, 2016, the Minnesota Court of Appeals would make a summary finding against Plaintiff and the presumption of harassment (while subject to an HRO) - that any social media post was not harassment - would be forever rebutted under the law in Minnesota.

38.     In reading the Appellate Decision ("Decision"), it is simply astonishing that Judge Kevin G. Ross – an elected judicial officer – would write a decision designed with the sole intent

to negatively portray a litigant and inflict unnecessarily (and irreparable) harm on him.  In

releasing his tabloid style opinion, he failed to cite any case law whatsoever in contravention of

state law and failed to identify any facts within the actual timeline of the breakup.  Instead, he

chose to extract wholly unrelated comments weeks before any breakup to destroy his career for

the remainder of his life.  In failing to cite context, Judge Ross was fully unaware these

comments were made in jest as a sarcastic response to Defendant Miller's vicious behavior

where she relentlessly mocked the Plaintiff to be more "confident" based on his general passive

behavior in line with his role as a computer programmer.  Even worse, City Attorney

Middlecamp had litigated previously before Judge Ross and even released a Tweet regarding his

Decision before it was publicly released.

      39.     As a result of the January 24th, 2017 Decision coupled with Defendant Schaefer's

fraudulent collateral pile-on HRO dove-tailed into the Decision, City Attorney Middlecamp was

able to engage in patently unethical conduct to publicize these claims outrageously through her

personal revenge Twitter platform @CardsAgstHrsmt.  Indeed, Defendant Schaefer's tactical

filing that radically changed the allegations just months before the *Miller v. Fredin* Appellate

Decision, left Plaintiff unprepared to defend himself against her allegations.  At a point where

the Plaintiff was already emotionally and financially exhausted, Defendant Schaefer's legal fees

would prove to bankrupt any chance to find competent legal defense.  Plaintiff was astonished

that a woman whom he had never met, spoken to, stood-up for a blind date, and had victimized

him through revenge pornography violations was able to not only obtain an HRO but use it to

manufacture a media campaign to destroy his professional livelihood.

      40.     Shortly before the Appellate decision was officially publicly released, City

Attorney Middlecamp created a Tweet publicizing the Decision.  In her Tweet, since deleted, she

claimed that Judge Ross "destroyed" and/or made other incendiary and outrageous claims

adverse to Plaintiff.    On January 24th, 2017, City Attorney Middlecamp sought to conceal her

prior knowledge and officially released a corrected Tweet (after the Decision was officially

released) while using City of Minneapolis resources to benefit her personal media platform

@CardsAgstHrsmt as described below:



(*See* Ex. 11. and Jan 24th, 2017

https://twitter.com/cardsagsthrsmt/status/823941229079470080?lang=en.)  Plaintiff immediately

received countless physical threats from City Attorney Middlecamp's friends and various

unwanted slanderous direct communication from countless individuals related to City Attorney

Middlecamp's conduct.

41.     In early February 2017, Plaintiff noticed one Twitter user offering vivid physical threats.  The Twitter user, Ryan Lindberg, had both illustrated the threats and made direct contact to the Plaintiff.  Again, Plaintiff ignored him as he has routinely done to the many unwanted contacts directed by Defendants.  After a background check, Mr. Lindberg has a domestic assault arrest and apparently maintained personal knowledge of Plaintiff.  And, according to their own Twitter admissions he was also City Attorney Middlecamp's close friend.  Still yet, the Ramsey County District Court and Referee Clysdale negligently refused to offer any protections against the anonymous account @CardsAgstHrsmt and/or any of the incoming threats.[9]  And, the office had continually rubber-stamped any allegation however farcical from any woman.

42.     Most important about these tweets, though, was the fact that City Attorney Middlecamp continued to make veiled threats at Plaintiff's employment and livelihood in these messages.  Just as she did at the January 24th, 2017 Tweet, City Attorney Middlecamp continued to gratuitously reference the full name of Plaintiff's employer in the written messages forecasting her not-so-subtle intent to come after Plaintiff's job at Trane and any other employment.

IV.     SGT. MCCABE'S UNLAWFUL SEARCH WARRANT, SWAT RAID, AND CIVIL SEIZURE

43.     When Sgt. McCabe began presiding over *Miller v. Fredin* on July 22, 2016, he began to send no-so-subtle messages that he intended to attack Plaintiff's residence and his ability to practice his career, no doubt in retaliation for Plaintiff's Court of Appeals action. Indeed, on the December 2016 call, Sgt. McCabe repeatedly and gratuitously referenced "coming over" with a swat team in the same breath that he was disingenuously accusing Plaintiff of misconduct.  (*See* December 2016 Call.)  It did not stop either.  As explained further herein,

---

[9] See e.g., https://twitter.com/ryanlindberg

on April 27th, 2017 Sgt. McCabe made good on his veiled threats by issuing a search warrant in

which he unlawfully publicly labeled Plaintiff's legitimate First Amendment Facebook and

social media posts as "harassment" without notice or an opportunity to be heard, which he

published and personally sent to the Hudson, Wisconsin police department resulting in Plaintiff's

home being invaded militarily by a swat team from the from the Saint Paul Minnesota, Hudson

Wisconsin Police departments and the St. Croix County Sheriff's department and seizure of most

if not all digital assets e.g., laptops, desktops, phones, watches, cords, hard-drives, memory

sticks, cameras and termination of his software business and ouster as a practicing member of the

local software engineering community in Minnesota.

44.      Based on Sgt. McCabe's unusual assignment to *Miller v. Fredin* coupled with his

wholly inappropriate behavior on the December 2016 call, it was apparent to Plaintiff that Sgt.

McCabe was predisposed in the matter and intended to hurt and retaliate against Plaintiff in the

proceeding for exercising his right to petition against Defendant Miller in the Court of Appeals

and apparently making social media posts adverse to Defendants. These fears came to fruition

on April 28, 2017 – less than a year after Sgt. McCabe began presiding over the case and without

Plaintiff so much as opening his mouth in Sgt. McCabe's presence – when Sgt. McCabe

sanctioned Plaintiff by speaking to City Attorney Middlecamp and @CardsAgstHrsmt in

February or March 2017 in order to generate more support for his continued desire to invoke an

unlawful raid and further publicly prejudice the Plaintiff for continuing to exercise his free

speech and for filing an appeal in *Miller v. Fredin*. However, the veiled threats were merely

pretext in order for Sgt. McCabe to publicly issue statements to @CardsAgstHrsmt that falsely

attacked Plaintiff's character, motives, reputation, livelihood and, most importantly, his ability to

practice his career. In fact, Sgt. McCabe's subsequent swat raid to serve City Attorneys HRO

and Defendant Schaefer's contempt motion was one of the most abusive, improper and retaliatory acts ever committed by a police officer that without question prejudiced the entire proceedings rendering it inconsistent with Due Process.   In other words, Sgt. McCabe abused process by collaterally using a search warrant and swat raid to impose Prior Restraint and terrorize the Plaintiff and his family.  (*See* Ex. 4.)

45.     On April 4th, 2017, Plaintiff authored a Facebook post which mapped City Attorney Middlecamp's identity to @CardsAgstHrsmt and offered legitimate criticism for the virtually endless unlawful actions taken by City Attorney Middlecamp, Defendant Schaefer, and Defendant Miller.

 **Brock Fredin** updated his status.
September 13, 2016 · 🔒 ▾                                               •••

Due to the egregious and misleading smear campaign, I have lost a job
and have so far been unable to secure re-employment over the past 4
months. It is my hope that Catherine Schaefer, Lindsey Middlecamp, and
Grace Miller will acknowledge their wrongful actions.

It goes without saying, this is a very serious matter and their public
campaign has trashed my career and likely cost me hundreds of
thousands of dollars. Additionally, Catherine Schaefer and Twitter
Defamation => (Lindsey Middlecamp) repeatedly retaliated against me
for either reporting Schaefer's criminal conduct or demanding removal of
content that violated the law. (Schaefer created fake sex ads that violate
the revenge porn law).

I've made special consideration to avoid any public postings and bare no
responsibility for the vicious public retaliation. During this difficult time, I
conducted myself with the utmost integrity.

I am aware my mother had a stroke during the week of the egregious
and misleading #fakenews City Pages article and now has deficits
walking. It goes without saying, stress from this crazy nonsense
contributed.

At this point, however, I implore responsible decision makers to take
action and prevent Lindsey Middlecamp, Catherine Schaefer, or Grace
Miller from engaging in any further misconduct. Sadly, I've raised these
concerns repeatedly but now face the desperate and hopeless endeavor
of going bankrupt and inability to make housing payments. During this
short period of unemployment, I've lost out on 50-60K of income. Again
– this avoidable experience is the result of their retaliation over petty and
lawful arguments. Catherine Schaefer published content that violates the
Minnesota Revenge Porn Law (fake sex ads) and sadly has so far been
celebrated for ruining others by a reporter from the City Pages. She was
peacefully told via a single email to remove the content and claimed this
single email was 'stalking'. This was a slanderous solicitation to pursue
vindictive measures against me.

Referee Elizabeth Clysdale's shameful ruling to Mr. Fredin makes clear
that the Ramsey County and Minnesota Judicial branch, Referee James
Street, Referee Rebecca Rossow, and Referee Colia Ceisel not only turn
a blind eye to Catherine Schaefer and Lindsey Middlecamp's egregious
misconduct, but that they endorse their behavior that is embarrassing to
the judiciary and threatens the well-being of litigants. More importantly,
it raises a serious question how someone like Brock Fredin who reports
misconduct of witnesses and legal officers only to be personally insulted
by Referee James Street and police officials could ever possibly get a
fair trial in any proceeding in the Minnesota Judicial Branch.

I have exhausted most peaceful lawful options. At this point, I am left
with describing how these parties and their supporters have sadly
abused or endorsed abuse of the legal system and viciously harmed

(*See* April 4th, 2017 Brock Fredin Facebook.)  Illustrative of the whole scheme by Defendants to intimidate was Defendants commencement of a scheme to retaliate against any and all legitimate First Amendment protected criticism.   The genesis of the retaliation centered around making knowingly false police reports for any and all speech published adverse to Defendants.  For example, on June 22nd, 2016, Defendant Miller began to "prosecutor shop" Facebook posts as HRO violations in a previous attempt to impose Prior Restraint.  For example, Defendant Miller's lawyer claimed "[Plaintiff] has continued to consistently post on FB about ... "In other words, Defendant Miller is admitting that Plaintiff's post "about" something is lawful.  And, seeks to impose Prior Restraint to unlawfully deprive him of his constitutional rights to speak freely by attempting to bring criminal charges by emailing Sgt. David McCabe and the City Attorney's Office.

| | |
|---|---|
| Subject | **Grace Miller v. Brock Fredin HR- CV-16-130** |
| From | Karmen McQuitty |
| To | |
| Cc | |
| Date | **2016-06-22 08:55** |

*roundcube*

---

- Screen Shot 2016-06-22 at 10.05.36 AM-1 Referee Street.png (~44 KB)
- Screen Shot 2016-05-11 at 10.08.31 AM.png (~35 KB)
- Screen Shot 2016-05-04 at 11.18.27 AM.png (~266 KB)
- Screen Shot 2016-05-04 at 11.18.03 AM.png (~23 KB)
- Screenshot_2016-06-18-11-03-30.png (~315 KB)
- Screen Shot 2016-06-22 at 10.05.36 AM-1 Referee Street.png (~44 KB)

Hello Referee Street-

I would like to update you on what has occurred since we were in court and ask that you consider a contempt of court. First, I have been in touch with both Sgt. McCabe at SPPD and Mike Seasley at the City Attorney's Office. While Sgt. McCabe agrees that there has been a violation of your order, Mike doesn't think he can prove up the case (his position is that the statute does not contemplate FB posts in third party contact-- I disagree).  As I recall, you specifically told him to stop posting about my client on social media.

Mr. Fredin has continued to consistently post on FB about Ms. Miller.  In addition, Mr. Fredin has now brought you into the mix-- he has posted about you on "datingpsychos.com" http://www.datingpsychos.com/.  I am attaching his post about you and some of the posts about my client.

In addition, I have emailed Mr. Fredin's attorney on three occasions asking him to direct his client to stop posting about my client.  I have received no response, and the posts have continued.

I am happy to appear on this if you'd like to have a hearing.

Thank you,
--
Karmen McQuitty, J.D., M.S.
Senior Staff Attorney
University of MN Student Legal Service
160 West Bank Skyway
219 19th Ave. South
Minneapolis, MN 55455

http://usls.umn.edu/

(*See* June 22nd, 2016 KM email.)

    46.    On March 1st, 2017, @CardsAgstHrsmt began releasing statements that were originally provided from Sgt. McCabe.  And, conversely City Attorney Middlecamp began providing unrelated information to Sergeant McCabe.

47.     On April 6th, 2017, Sergeant McCabe deliberately concealed City Attorney Middlecamp's identity by redacting it from reports to conceal knowledge of any investigation leaks and/or prior communication with her:

> "I (Sgt McCabe, SPPD Sex Crimes), **I** was notified about the following website, which details parts of this case, … this information was passed on to SPPD SIU"

> (*See* SPPD 16253015 ¶ 1-4 4/6/17)

48.     On April 12th, 2017, the Ramsey County Sheriff's department attempted unsuccessfully to serve a Civil Contempt order from Defendant Schaefer. *A certificate of unserved process was filed in Ramsey County District Court.* (*See* Ex. 5.)

49.     On April 14th, 2017, City Attorney Middlecamp petitioned for an HRO in Ramsey County District Court citing the April 4th, 2017 Facebook post. In her petition, she admitted to owning and operating @CardsAgstHrsmt anonymously. In other words, she petitioned for an HRO to collaterally abuse process and conceal her misconduct on @CardsAgstHrsmt and retaliate against the Plaintiff.

50.     Given the all-out media war on Plaintiff, it remains ironic that City Attorney Middlecamp was able to mischaracterize this post as a "threat" to abuse process by collaterally using her HRO as a weapon to limit Plaintiff's speech and request a Raid (using her public position to solicit law enforcement) of his personal home in Hudson, Wisconsin.

51.     At this stage, City Attorney Middlecamp, Defendant Schaefer, and Defendant Miller had extensive communication with Sgt. McCabe. As an initial matter, On September 21st, 2017, City Attorney Middlecamp made on-the-record statements indicating communication with Sgt. McCabe prior to the Raid. (*See* September 21st, 2017 *Middlecamp v. Fredin* Evid. Hear.)

52.     On April 17th, 2017, Ramsey County Sheriff Jack Serier attempted unsuccessfully to serve City Attorney Middlecamp's ex-parte HRO order. *A certificate of unserved process was filed in Ramsey County District Court. (See Id.)*

53.     On April 25th, 2017, St. Croix County Sheriff Scott Gostovich attempted unsuccessfully to serve a Civil Contempt order from Schaefer at least three (3) separate times on April 25th and April 27th.  And, stalked the Plaintiff repeatedly by calling his personal phone number three (3) times, leaving an aggressive voicemail message,
and knocking extraordinarily loudly on his front door for extended periods of times so as to alert his neighbors.  Additionally, he used his squad car light to peer through his bedroom window several times to harass the Plaintiff. *A certificate of unserved process was filed in Ramsey County District Court.  (See Id.)*

54.     On April 25th, 2017, St. Croix County Sheriff Scott Gostovich attempted to serve City Attorney Middlecamp's ex-parte HRO at 5:50PM.  It bears noting, Minnesota process service laws do not allow service after dawn. *A certificate of unserved process* was filed in Ramsey County District Court. *(See Id.)*

55.     On April 25th, 2017, St. Croix County Sheriff Scott Gostovich attempted to serve City Attorney Middlecamp's ex-parte HRO at 8:57PM.  It bears noting, Minnesota process service laws do not allow service after dawn. *A certificate of unserved process* was filed in Ramsey County District Court. *(See Id.)*

56.     On April 25th, 2017, St. Croix County Sheriff Scott Gostovich attempted to serve City Attorney Middlecamp's ex-parte HRO. *A certificate of unserved process was filed in Ramsey County District Court.  (See Id.)*

57.     On April 26th, 2017, St. Croix County Sheriff Scott Gostovich attempted to serve City Attorney Middlecamp's ex-parte HRO at 2:25PM. *A certificate of unserved process was filed in Ramsey County District Court. (See Id.)*

58.     On April 27th, 2017, St. Croix Sheriff Scott Gostovich filed another *certificate of unserved process was filed in Ramsey County District Court. (See Id.)*

59.     After being unable to serve the petitions via regular civil service, On April 27th, 2017 Sgt. McCabe requested a search warrant from the Hudson Police department by way through detective Tracy Hall.

60.     In his request, Sgt. McCabe made a showing of materially knowingly false deliberate misstatements in the application for the warrant.   Indeed, in an effort to mislead and fraud the Saint Croix County Circuit Court, Hon. Judge Michael Waterman, and thereby grant himself an unlawful search warrant to serve City Attorney Middlecamp's HRO.   In other words, Sgt. McCabe claimed Facebook posts were "harassment" to collaterally retaliate, conceal his and City Attorney Middlecamp's leaks on @CardsAgstHrmst, and harm the Plaintiff for seeking legal redress and for speaking out against misconduct to impose military style Prior Restraint. Moreover, Sgt. McCabe's true intent for seeking a search warrant was to serve City Attorney Middlecamp's HRO and Defendant Schaefer's contempt motion.   Indeed, the Supreme Court has held that a search warrant is in question when substantial facts are falsely alleged or mischaracterized: "False statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" Franks *v. Delaware,* 438 U.S. 154 (1978)

such property as a means of committing a crime.

3. The property above described constitutes evidence which tends to show a crime has been committed, or tends to show that a particular person has committed a crime.

The facts tending to establish the foregoing grounds for issuance of a search warrant are as follows:

1. Your affiant is a Detective with the Hudson Police Department, with 13 years of law enforcement experience. Your affiant investigates ongoing criminal activity within the City of Hudson, St. Croix County, Wisconsin. Your affiant has knowledge and experience investigating narcotics, property crimes and crimes against persons.

2. On Wednesday, April 27, 2017, your affiant was contacted by the Saint Paul Police Department and was requested to assist them in drafting and executing a search warrant at 1905 Iris Bay, in the City of Hudson. Sergeant McCabe had informed your affiant of the information in paragraphs 3 through 13. Your affiant knows Sergeant McCabe to be reliable as he is in good standings with the Saint Paul Police Department and has been involved throughout the investigation.

6. On 02/09/2016, FREDIN began posting messages on the public portion of his Match.com account page. These posts were messages directed towards G.E.M., and/or about G.E.M.. This is known because she was identified in these messages by her first name and as a former romantic interested. The posts also contained specific details about G.E.M. to include mention of her specific military back ground. G.E.M. twice posted on FREDINs profile page, requesting that he remove this information about her. However, he simply added more posts about her and their relationship.

7. On 03/28/2016, it was brought to G.E.M.'s attention, by an acquaintance, that FREDIN was also using his Facebook.com profile to post similar messages about G.E.M.. FREDIN's account has since been verified with Facebook, and that data recovered through a warrant served on Facebook.

8. Since these posts have been made a hearing for HRO #62-HRCV-16-46 took place in which Ramsey County Referee Street opined that FREDIN's posting about G.E.M. on his social media sites was prohibited by the harassment order.

9. Throughout the month of July 2016, FREDIN began posting about G.E.M. on a website called datingpsychos.com. These posts were reported the to Saint Paul Police as defamatory and harassing. These posts were made by a user with an email address of [field.gator@gmail.com].

11.    In addition on 1/23/2017, the Minnesota Court of Appeals (A16-0613), affirmed the lower courts issuance of the HRO (#62-HRCV-16-46), and opined that FREDIN has continued his harassment of G.E.M. through social media, and online.

12.    FREDIN has continued to stalk and harass G.E.M., through social media, with his last known post on 04/05/2017. Criminal charges are currently under review by the Saint Paul City Attorney for the charges of Stalking/Harassing (mss 609.749).

(*See* April 27th, 2017 Search Warrant.)   Specifically, in paragraph 8, Sgt. McCabe claims "Referee Street opined that [Plaintiff's] posting about Defendant Miller on his social media sites (Facebook) was prohibited by the harassment restraining order."  Not only did Referee Street never say that, Sgt. McCabe simply lied in order to get a search warrant.  Indeed, Sgt. McCabe has endorsed wholly false statements in order to impose Prior Restraint.  Moreover, paragraph 12 verifies that the April 5th, 2017 Facebook post criticizing Defendants actions was the true basis for seeking a terrifying no-knock swat raid.  Lastly, in paragraph 2, Sgt. McCabe is confirmed to have provided these statements to the Hudson, Wisconsin police department.

61.    On April 28th, 2017, City Attorney Middlecamp, Defendant Miller, and Defendant Schaefer directed a no-knock swat style raid on Plaintiff's home in Hudson, Wisconsin to unlawfully serve City Attorney Middlecamp's ex-parte HRO and Defendant Schaefer's constructive contempt motion.  Using her role as Minneapolis Assistant City Attorney, she reached out to her boss, acting City Attorney Susan Segal, and other Saint Paul/Minneapolis law enforcement officials to carry out the unlawful raid. As a result, Sgt. David McCabe seized virtually all of Plaintiff's digital assets - over sixty (60) items - including twenty items that were never accounted for.   In total, about $40,000 worth of computers and servers were seized despite the fact that Plaintiff had already spent his life savings, been bankrupted, and already had his

career destroyed through negative press coverage over the Defendants fraudulent actions. In other words, Defendants abused process by attempting to silence Plaintiff by unlawfully seizing all of his computers and retaliating against him for exposing her as the author of the @CardsAgstHrsmt platform. Moreover, the seizure of all his assets would cause undue burden and limit his ability to gain competent legal representation in further collateral matters fraudulently perpetuated by the Defendants. Defendants abused process further by using long arm statutes designed for hardened violent felons or national security concerns. In spite of this injustice, Plaintiff has never been accused of being violent, creating any sort of known scene, or engaging in any pattern of conduct that would rise to this level. In fact, Plaintiff has never used any drugs, does not smoke, or drink. Plaintiff has a graduate level engineering education and has tried to reasonably apply himself as a productive citizen. Plaintiff and his fiancé (a trauma nurse) were subjected to inhumane treatment/false arrest and effectively held stationary/handcuffed for many hours without food, water, or even a toilet.

62.      As Plaintiff would later find, Referee Clysdale also maintained a relationship with the Saint Croix County Sheriff's office due to her residency in Saint Croix County in the City of Somerset. In other words, just about everyone conspired together collaterally to abuse process to bring a search warrant in an effort to silence whistleblower websites that exposed their misconduct.

63.      It should be further noted during the April 28th, 2018 Raid, Sgt. McCabe entered by breaking the front door without notice in a terrifying no-knock raid. A group of officers with automatic assault rifles marched loudly up the stairs yelling frantically. At first confrontation, Plaintiff was lying without clothes in bed with his fiancé when suddenly a Hudson Wisconsin police officer pointed a semi-automatic AR-15 with an attached laser scope directly at his head.

Plaintiff's fiancé began to frantically scream before Sgt. David McCabe aggressively pulled him

naked out of bed and held him down on the floor standing over him – to mimic the sarcastic

imaginary response memorialized by Judge Ross's Appellate opinion. After requesting

information on why his house was raided by a swat team, Sergeant David McCabe outrageously

claimed that the innocent Match.com profile edit (days or hours after a petty argument) that

happened nearly two years before the Raid was the legal basis and that he was being criminally

charged for an HRO violation as it relates to this nonsense. Furthermore, Sergeant McCabe

claimed that Plaintiff should "stop posting about City Officials and/or judges on Facebook or the

Internet" in an effort to indicate his **true reason** for raiding his home. At this point, Plaintiff

became increasingly irritated and told his fiancé to remain silent while Plaintiff questioned

Sergeant McCabe about his communication with Defendants and Ms. Middlecamp. During this

exchange, Sgt. McCabe knowingly lied to the Plaintiff by claiming "I don't know Lindsey

Middlecamp." As will be explained in greater detail below, Defendant Miller and Defendant

Schaefer and City Attorney Middlecamp not only communicated with Sgt. McCabe prior to the

Raid, City Attorney Middlecamp knowingly provided information to direct the raid to serve her

HRO. Furthermore, Plaintiff had no interaction with her whatsoever prior to her state court

action. This was made clear when SPCA Assistant City Attorney Stephen Christie claimed that

Ms. Middlecamp "[Plaintiff] may have been wronged by Middlecamp." In an email on August

2nd, 2017 to his then-counsel Barry S. Edwards.

64.     During the April 28th, 2017 Raid, Plaintiff was served with City Attorney

Middlecamp HRO and Defendant Schaefer's contempt motion by a St. Croix County deputy.

65.     On July 20th, 2017, during the first *Middlecamp v. Fredin* evidentiary hearing

acting Minneapolis City Attorney Susan Segal admitted to prior knowledge of the Raid by

making on-the-record statements. (See *Middlecamp v. Fredin* July 20th, 2017 Tran.)

66.     Furthermore, in Early April 2017, Defendant Schaefer filed her contempt motion

at the same time. In her contempt motion, she raised questions of Plaintiff's April 4th, 2017

Facebook post. In other words, Defendant Schaefer used the contempt motion to impose Prior

Restraint.

V.     HOSTILE CONTEMPT HEARINGS TO IMPOSE PRIOR RESTRAINT

67.     As described above, Defendant Schaefer filed her contempt motion at the same

time. In her contempt motion, she raised questions of Plaintiff's April 4th, 2017 Facebook post.

Defendant Schaefer has used knowingly false police reports, swat raids, intimidation, and now

contempt motions to impose Prior Restraint.

68.     On May 2nd, 2017, Defendant Schaefer and her lawyer Peter Mayer claimed

Plaintiff should go to "prison" for making this Facebook post. Furthermore, Referee Clysdale

said the contempt hearing was "dismissed with prejudice." (*See* May 2nd, *Schaefer v. Fredin*

Contempt Tran.) As a result, Defendant Schaefer was warned not to bring a similar motion

again. And, to top it off, Defendant Schaefer failed to even show up. Defendant Schaefer's

frivolous motions were used to harass the Plaintiff forcing him to expend increasingly absurd

legal fees. Defendant Schaefer was not content with merely attacking Plaintiff, however. She

went even further by improperly taking photos of his family and filing them in her contempt

motions. Referee Clysdale wholly ignored Defendant Schaefer's unethical conduct of conspiring

with City Attorney Middlecamp and including unrelated photos and information regarding his

family in her filings. And, to illustrate the double-standard, at the same hearing Referee Clysdale

refused to address Plaintiff's complaints over Defendant Schaefer's prejudicial media coverage

that destroyed his career all the while Defendant Schaefer was able to bring abusive legal process

over single Facebook posts.

69.     While Plaintiff endured one slight after another by Mr. Mayer, Defendant

Schaefer, and Referee Clysdale at the May 2, 2017 hearing, he sat quietly and did not lash out in

anyway.  After Referee Clysdale finished listening to Mr. Mayer's absurd argument, she looked

sternly at Plaintiff and made a degrading remark that "free speech has its limits" before issuing

her orders and directions. (*See* May 2nd, Transcript.)  And, Referee Clysdale made this statement

after Plaintiff's career was destroyed through the tabloids in a showing that clearly indicated her

substantial lack of understanding of the underlying facts of the case.

## VI.     REFEREE ELIZABETH CLYSDALE AND *MIDDLECAMP V. FREDIN*

70.     As recent mounting media coverage has uncovered and detailed, Family Courts

are beginning to come under fire for running cases as profiteering schemes for attorneys rather

than fashioning results in the best interests of the parties and the family as a whole.  Indeed,

evidence slowly permeating from Family Courts shows that judges allow cases to drag on for

years both in an effort to avoid making a decision (no doubt in hopes that one party will run out

of money or emotional fuel and settle the case without court intervention) and to generate

enormous profits for individuals working in the Family Court industry – *e.g.*, attorneys,

government employees, social workers, domestic violence advocates, etc.  In doing so, these

Family Courts perpetuate cases that allow matrimonial and family attorneys to siphon assets

from litigants and run up astronomical legal fees that depletes the family of their income and

savings.  Attorneys have little incentive to advise clients to settle their cases when the Family

Courts allow litigation to become decade long ordeals with litigants constantly in-and-out of

court. And to further compound the problem, Courts are awarded federal grants on a per line

item basis for any Order imposed and attorneys often disclose their retainer agreements and

hourly billing rate at the outset of the case in matrimonial and family actions – something that is

not done in any other type of litigation. By knowing the rates of competing attorneys through

this disclosure, family attorneys have effectively become cartels setting virtually identical prices

for their legal services. These cartels congregate in groups such as The Minnesota Women

Lawyers and the Ramsey County Bar composed almost entirely of family attorneys and judges.

A. The July 20th, 2017 *Middlecamp v. Fredin* Hearing

71.     From the outside of the case, Referee Clysdale engaged in every one of these

unethical tactics and tropes in *Middlecamp v. Fredin*. As explained below, Referee Clysdale

repeatedly denied Plaintiff a legitimate and fair opportunity to litigate the contested HRO that

she imposed without a hearing or fact-finding, to which Plaintiff had an absolute right, in an

effort to prolong the matter at the expense of Plaintiff who had already been bankrupted and had

his professional livelihood destroyed through her improper judgements.

72.     Although Plaintiff's lawyer had withdrawn on July 3rd, 2017 citing retaliation

from City Attorney Middlecamp and the Saint Paul City Attorney's Office, Referee Clysdale

ordered that the evidentiary hearing would still take place on July 20th 2017, against the

continuance requested by the Plaintiff. Referee Clysdale did not attempt to reschedule another

date on the calendar. Thus, at the commencement of the evidentiary hearing "on the limited

issue of City Attorney Middlecamp's HRO," the Plaintiff was fundamentally unprepared and

unable financially to hire counsel directly resulting from the widespread media coverage incited

by City Attorney Middlecamp. Through their continued unlawful and tortious actions largely set

forth in this Complaint, Defendants have effectively bankrupted Plaintiff financially. More

importantly, Plaintiff was unable to retain counsel out of fear of retaliation by Defendants and or the Saint Paul City Attorney's Office.[10]  Plaintiff should not be prejudiced because he was forced to seek redress in Referee Clysdale's court as a pro se litigant as a result of Defendants bad-faith conduct that has substantially impaired his ability to retain counsel.

73.    In July 2017, on the advice of his then-counsel, Barry S. Edwards, Plaintiff raised an ex-parte harassment restraining order against City Attorney Middlecamp including every piece of @CardsAgstHrsmt evidence, threats, swat raid information, email communication from City Attorney Middlecamp, and various other pieces of evidence culminating in a forty-page (40) pleading with forty (40) exhibits.  In his ex-parte pleading, he repeatedly made the Court aware of his sudden lack of ability to gain employment with the false media coverage and the sensationalist tactics by City Attorney Middlecamp.  Instead, Referee Clysdale would deny and dismiss the case in an effort to turn a blind eye to Defendants misconduct.

74.    Plaintiff was further denied a neutral arbiter at the proceeding with Referee Clysdale as the fact-finder.  Referee Clysdale and City Attorney Middlecamp were directly responsible for the diminution in Plaintiff's income by and through Referee Clysdale's rubber stamped HRO's – with readily available information at the outset that the parties had never met or spoken - and Defendant Middlecamp's admitted extrajudicial conduct of providing the rubber-stamped Decisions to the media, including *The City Pages* and her own *@CardsAgstHrsmt*.  In other words, Referee Clysdale was a necessary fact witness to establish that it was her unlawful conduct and rubber stamps that resulted in Plaintiff losing his job at *Trane* and his earning

---

[10] Barry S. Edwards made statements recorded on audio claiming that his "twenty or so other cases in Ramsey County" were threatened by the Saint Paul City Attorney's Office.  As a result, he withdrew from the case and is now awaiting suspension from the local bar.

potential irreparably diminishing.  Despite the overt and apparent conflict of interest, Referee
Clysdale refused to recuse herself from the case.

75.    Moreover, unlike any other type of litigation, the Family Courts tack onto this
profiteering enterprise by appointing a multitude expenses such as $322.00 fee to contest ex-
parte Orders, $550.00 Appeal fees, $77.00 motion fees, and various other fees for initiating
subpoenas to name a few of these nefarious expenses directed primarily at men.  In addition to
ever-mounting legal fees paid to their own attorneys, male litigants wind up paying tens of
thousands of dollars – and sometimes hundreds of thousands of dollars – to these non-party
entities that serve absolutely no purpose other than to stick their hands in the profiteering scheme
churned on the litigants.   In other words, there is overwhelming evidence that illustrates many
Family Courts operate as a massive racketeering scheme taking advantage of the families and
litigants who unwittingly and unknowingly turn to the court system in times of dispute.

76.    Referee Clysdale again took the unprompted opportunity to attack Plaintiff.  Prior
to the July 20, 2017 hearing, Plaintiff filed his motion to disqualify Michael P. Boulette as
Attorney for City Attorney Middlecamp for conflict of interest (his firm had a prior attorney-
client relationship with Plaintiff).  Likewise, Michael P Boulette's managing boss, Daniel
Goldberg, filed an affidavit corroborating the conflict.  In a clear act of retaliation and
suppression of Plaintiff's right to petition the court, Referee Clysdale denied Plaintiff's motion
without opposition.  In the order denying Plaintiff's motion without opposition, Referee Clysdale
focused yet again on attacking Plaintiff.

77.    Immediately at the outset of the July 20th, 2017 hearing, the hearing was tainted
by City Attorney Middlecamp and her attorney Michael P. Boulette and their attempt to use the
trial to engage in false and baseless *ad hominem* attacks on Plaintiff.  In order to obtain her HRO,

City Attorney Middlecamp made outrageous and knowingly false claims that Plaintiff had "raped" a woman seven (7) years ago. Of course, Plaintiff had no interaction with City Attorney Middlecamp whatsoever and no less than three witnesses debunked City Attorney Middlecamp's falsified allegations. Referee Clysdale failed to admonish City Attorney Middlecamp and did nothing to curb the litany of baseless allegations directed at Plaintiff that would follow. Of course, City Attorney Middlecamp failed to provide any documents and/or discovery despite the fact they were served with several requests e.g., requests for documents, interrogatories, etc.

78.     On June 15th, 2017, City Attorney Middlecamp served a request for admissions. On July 13th, 2017 the Plaintiff provided responses to City Attorney Middlecamp's requests for admissions within thirty (30) days in the form of appropriate objections prior to any trial stage. (*See* Ex 12.) As a result of City Attorney Middlecamp's initial discovery, on July 13th, 2017, the Plaintiff served City Attorney Middlecamp with requests for documents, interrogatories, and requests for admission (1st set) to which City Attorney Middlecamp never responded. (*See* Ex 13.). During the first trial stage, City Attorney Middlecamp admitted the requests for admissions into evidence in violation of Minn. Civ. P. Rule 36.01 whereby:

> "The matter is admitted **unless within 30 days** after service of the
> request, or within such shorter or longer time as the court may allow, the
> party to whom the request is directed **serves upon the party requesting
> the admission a written answer or objection addressed to the matter**,
> signed by the party or by the party's attorney;" (*See* Minn. Civ. P. 36.01)

79.     While Plaintiff remained quietly ready to begin trial, Referee Clysdale ordered that she was "splitting" the two cases *Middlecamp v. Fredin* and *Fredin v. Middlecamp* to allow any allegation adverse to City Attorney Middlecamp to be sorted into a separate case that she would later dismiss thereby protecting City Attorney Middlecamp from any legal consequence.

80.    It became clear that Referee Clysdale had no intention of allowing Plaintiff to

have a *full and fair* hearing in any reasonable or timely fashion.  Despite multiple requests from

Plaintiff to Referee Clysdale that she hear his pre-trial motions and allow him to enter evidence,

Plaintiff was left at the whims of City Attorney Middlecamp and Michael P. Boullette as to when

he could enter evidence or even speak.  As a result of these mounting difficulties in the litigation,

Referee Clysdale outrageously failed to allow Plaintiff to enter any evidence, have any of his

pre-trial motions heard, or even conduct any discovery whatsoever to discern the facts of the

case.  Indeed, the overwhelming evidence was that City Attorney Middlecamp had taken extreme

and outrageous actions to publish over fifty (50) tweets on @CardsAgstHrsmt, orchestrated a

tabloid article to hundreds of thousands of people, and stalked him by arranging for multiple

women to pile-on piggy-back HRO's.  Nonetheless, Plaintiff was unable to even suggest that

City Attorney Middlecamp had even used a Twitter account due to her absurd arguments that she

ran the Twitter account "anonymously" thereby apparently giving her immunity to defame and

destroy anyone in her vicinity.  Moreover, Plaintiff's pre-trial Motion to Dismiss was tossed

despite a very serious Jurisdiction claim (Plaintiff lives and works in Wisconsin and City

Attorney Middlecamp lives and works in Hennepin County) yet the proceeding was being heard

in Ramsey County.

81.    Similarly, despite the fact that Michael P. Boulette was appointed approximately a

month and a half prior to the commencement of the July 20, 2017 hearing, he whole heartedly

adopted City Attorney Middlecamp's allegations of domestic harassment and/or categorically

absurd and outrageous rape claims in his statements at the hearing.  Yet, Michael P. Boulette's

records confirm that he never conducted any investigation into the allegations as he was under

obligation to do under the law.  Michael P. Boulette never asked to see the copies of police

reports from the Saint Louis Park police department documenting the allegation (they do not

exist). He never asked to see Plaintiff's photographs of @CardsAgstHrsmt Tweets City

Attorney Middlecamp inflicted on him and wholly ignored City Attorney's sworn admissions

that she had abused Plaintiff leaving permanent emotional scaring to his life. Furthermore,

Michael P. Boulette did not seek the alleged rape victim's medical records, the City Attorney

Middlecamp's medical records, seek to interview witnesses to the alleged altercations and

injuries or attempt to obtain any other evidence that would shed light on the allegations. Instead,

he simply adopted City Attorney Middlecamp's allegations without any investigation or

hesitation revealing his predisposition against Plaintiff. Even worse, Michael P. Boulette and

City Attorney Middlecamp previously worked together as colleagues at Lindquist and Vennum.

82.    Perhaps worst of all, Michael P. Boulette made claims at the July 20, 20147

hearing (which continued throughout the litigation and as recently as last week) that Plaintiff was

a "rapist". Of course, the allegation was wholly baseless and devoid of any facts to support it.

It was all the more stunning given that fact that at that time City Attorney Middlecamp had at

that time published and stolen **thousands** of photos showing men in compromised positions

while they are naked. Michael P. Boulette exhibited absolutely no concern for City Attorney

Middlecamp's multiple unlawful actions that brought shame to the Minnesota Judicial Branch.

83.    On July 17th, 2017, prior the first trial stage, City Attorney Middlecamp and

Michael P. Boulette issued a subpoena *duces tecum* for whistleblower website

lindseymiddlecamp.com in Maricopa County, Arizona. On September 21st, 2017, Defendant

Middlecamp admitted on-the-record during live testimony to receiving the subpoena response

and relevant information hereto. However, Defendant Middlecamp failed to provide such

response prior to trial, during, or thereafter in violation of Minn. Civ. P. Rule 45.04(5):

"The party issuing a subpoena for production or inspection shall make available to all parties any books, papers, documents or electronically stored information obtained from any person following issuance of a subpoena to that person. If production or inspection is made at a time or place, in a manner, or to an extent and scope, different from that commanded in the subpoena, the party issuing the subpoena must give notice to all parties to the action at least seven days in advance of the rescheduled production. Any party may attend and participate in any noticed or rescheduled production or inspection and may also require production or inspection within the scope of the subpoena for inspection or copying." (*See* Minn. Civ. P. 45.04(5))

84.     Apart and aside from the misconduct of the Attorney for City Attorney Middlecamp, Referee Clysdale antagonism towards Plaintiff was well-apparent at the July 20, 2017 hearing. She openly mocked Plaintiff in open court throughout the hearing, including an incident where she raised her voice, according to Referee Clysdale, Plaintiff did not know how to lay the foundation to enter a document into evidence. Referee Clysdale nit-picked Plaintiff throughout the proceeding even going so far as to sharply chastise Plaintiff for inadvertently requesting to show and enter evidence while cross examining City Attorney Middlecamp's witnesses. Even worse, she repeatedly accused Plaintiff of rolling his eyes and sighing, which was categorically not true. It was evident that Referee Clysdale was overtly hostile to Plaintiff throughout the hearing as if she was attempting to provoke Plaintiff.

85.     Referee Clysdale's attacks did not stop with Plaintiff, unfortunately. She instead attacked Plaintiff's mother, Kathleen Mary Fredin ("Ms. Fredin"). At that stage in the litigation, Ms. Fredin had nothing to do with the case other than potentially being a witness at trial. Ms. Fredin was not at issue, much less mentioned, in any of the motions that were decided in the July 20, 2017 hearing. Referee Clysdale's inappropriate and outlandish references to Plaintiff's mother included, but were not limited to the following:

(screaming violently) If your phone rings, I will have a deputy take it and remove you. (*See July 20th, 2017 Middlecamp v. Fredin Tran.*)

86.     The intent behind the inclusion of these attacks was clear:  Referee Clysdale's bad faith attacks were an attempt to further antagonize Plaintiff while at the same time attempting to muddy his character and family in an order that Referee Clysdale knew would be appealed to the Appellate Court.  Referee Clysdale's attacks on Plaintiff's mother were patently inappropriate, retaliatory, well below the belt and once again indicative of low-brow bad faith character.

87.     Specifically, Referee Clysdale admitted that she allowed City Attorney Middlecamp to sustain any objection and enter any evidence but overruled Plaintiff from making any objections or entering any evidence because City Attorney Middlecamp made allegations concerning *Miller v. Fredin* and *Schaefer v. Fredin* and outrageous knowingly false "rape" and "harassment" claims over posts on Facebook.  Throughout the trial, Referee Clysdale allowed Michael P. Boulette to extensively examine and cross-examine witnesses on the claims against Plaintiff.  No doubt, Referee Clysdale was intent on using the *Middlecamp v. Fredin* trial to indirectly gain favor with the Minneapolis City Attorney's Office.  In total, Plaintiff made many valid objections, but all were summarily overruled without grounds.  However, Michael P. Boulette was able to object successfully without fail.

88.     When Referee Clysdale began presiding over *Middlecamp v. Fredin* on July 20, 2017, she began to send no-so-subtle messages that she intended to attack Plaintiff's employment and his ability to practice his career, by challenging Plaintiff albeit cowardly under her breath to get an "injunction" to stop her eventual Prior Restraint order.  As a result, Referee Clysdale was overtly pre-meditating her ruling in *Middlecamp v. Fredin*.

89.     With respect to the substance of the July 20, 2017 hearing, only three fact witnesses testified, which consisted of two friends of City Attorney Middlecamp and her boss

(who had an incentive to cover-up her conduct). The hearing concluded during the testimony of the fourth witness, City Attorney Middlecamp who was still in the middle of Plaintiff's cross-examination. Despite the fact that Referee Clysdale had deemed the hearing an "emergency hearing" on the limited issue of City Attorney Middlecamp's HRO, she calendared the next hearing date for September 21, 20147 well-over two months away. Once again, it was apparent that Referee Clysdale intended to stretch out and prolong the hearing to perpetuate Plaintiff having any resolution and thwart his access to the courts.

### B. The September 21st, 2017 *Middlecamp v. Fredin* Hearing

90.     Referee Clysdale held a return hearing for the harassment petition on September 21, 2017. However, she conducted no fact-finding on that date, even though she was required to do so by law and made no inquiry to the parties as to what they believed would be an appropriate briefing schedule. Again, this was indicative of Referee Clysdale's bad faith and retaliatory strategy to prolong the matter and saddled Plaintiff with indefinite pile-on orders and burdensome legal fees.

91.     Referee Clysdale's directions and behavior from the outset of the September 21st, 2017 hearing were bizarre to say the least. For example, Referee Clysdale prohibited Plaintiff asking any questions related to City Attorney Middlecamp's unlawful coordination of a swat raid of Plaintiff's personal home in Hudson, Wisconsin. Referee Clysdale's assigned court officer, Officer Nqoua Yang, stood behind Plaintiff's counsel table next to Plaintiff's mother and even began acting as a witness by making statements on-the-record disparaging Plaintiff and his mother.

92.     Throughout the proceeding, Referee Clysdale repeatedly disparaged Plaintiff and his mother, Ms. Fredin. (*See* September 21, 2017 Transcript.) To make matters even more

difficult, Referee Clysdale repeatedly forced the Plaintiff to stop asking questions related to City

Attorney Middlecamp's @CardsAgstHrsmt account including the fact Plaintiff sought to go over

each Tweet directed at Plaintiff as an individual exhibit. This led to repeated slights by Referee

Clysdale directed at Plaintiff. In the face of Referee Clysdale's repeated disparaging statements

about Plaintiff, she would outrageously scream "I can read them myself!" in an effort to prevent

Plaintiff from continuing efforts of entering evidence.

93.     While Plaintiff recognized Referee Clysdale's behavior as evidence suppression,

he instead began verbally reciting each Tweet into evidence during his own round of testimony.

At this point, Referee Clysdale would repeatedly stop him preventing him from entering

evidence and suddenly stopping the hearing when he refused.

94.     Approximately two minutes after attempting to verbally recite the Tweets, Officer

Yang approached Plaintiff. Officer Yang inquired as to whether Plaintiff intended to "look at his

mother" during the proceeding. Plaintiff responded by initially ignoring him, but that Officer

Yang should not be making statements on-the-record or attempting to direct the proceeding.

95.     While Plaintiff endured one slight after another by Referee Clysdale at the July

20th and September 21st 2017 hearing, he sat quietly and did not lash out in anyway. After

Referee Clysdale finished issuing her orders and directions, Plaintiff stood up in utter disbelief

and walked out of the courtroom to protest Referee Clysdale gratuitous and inappropriate attacks

contained in her September 21, 2017 decision. Specifically, Plaintiff stood up and walked

briefly past the courtroom door for thirty (30) seconds and returned to counsel table.

96.     Upon returning to the courtroom, Referee Clysdale dismissed his HRO case in

*Fredin v. Middlecamp* citing "waived appearance" to conceal City Attorney Middlecamp's

ongoing stalking and terrorizing behavior including soliciting swat raids to serve her HRO.

Plaintiff had just undergone a grueling three (3) hour trial in *Middlecamp v. Fredin* and was

physically present. As a result, Referee Clysdale was able to deliberately hide City Attorney

Middlecamp's misconduct by overtly lying that Plaintiff waived his appearance. In simple

terms, Plaintiff was simply aghast that Referee Clysdale would continue to retaliate and issue

rubber-stamped orders when it was clear that the Order had no legal basis as described above.

C. The October 2nd, 2017 Prior Restraint Order in *Middlecamp v. Fredin*

97. What is most disheartening, however, is that in less than a year after taking over

the case(s) Referee Clysdale's harassment and personal vendetta towards Plaintiff utterly

destroyed Plaintiff, his family and, most importantly, contributed to his mother's stroke. Not

only did Plaintiff lose his job as a result of the media attention Defendants solicited to the case

explained further herein. Referee Clysdale absurd Orders and Defendants media coverage left

Plaintiff penniless and unable to afford housing costs. In financially destroying both Plaintiff

and his family through their solicitation of adverse and disparaging media attention in *Miller v.*

*Fredin and Schaefer v. Fredin*, her imposition of unlawful Prior Restraint rulings, her conduct of

ensuring that the case would proceed to a trial so that she could make and fabricate adverse fact-

findings against Plaintiff to attack his career and her seeming endorsement of City Attorney

Middlecamp and Defendants racketeering scheme to churn fees on Plaintiff, Referee Clysdale

destroyed any financial future for the Plaintiff and left him in dire financial straits for years to

come. And, most disturbingly, Referee Clysdale saw to it that a now seventy-two-year-old

mother was left without a son capable of providing financially indefinitely particularly so when

she suffered a stroke directly as a contributory result of her absurd rulings and media coverage.

To say that Referee Clysdale and City Attorney Middlecamp are sick and disturbed individuals,

as the record in this case bears out, would be putting it far too lightly.

98.     Specific to this case, however, there is no question that Referee Clysdale's

conduct and rulings in *Miller v. Fredin, Schaefer v. Fredin and Middlecamp v. Fredin* were

entirely inconsistent with Due Process and made with the bad faith intent to harass and retaliate

against Plaintiff.  As explained further below, throughout the proceeding, Referee Clysdale

fabricated findings adverse to Plaintiff, suppressed highly relevant and necessary evidence to

Plaintiff's case (without explanation), smeared Plaintiff's character by defaming him in decisions

that City Attorney Middlecamp personally disseminated to the media, likely altered transcripts to

cover-up unlawful conduct they engaged in, commenced evidentiary hearing for the sole purpose

of making adverse findings against Plaintiff without affording him notice or an opportunity to be

heard, verbally abused Plaintiff and even attempted to instigate a verbal altercation between

herself and Plaintiff on at least one occasion just to name a few instances of outrageous,

unethical and wholly inappropriate behavior Referee Clysdale engaged in while presiding over

*Middlecamp v. Fredin* that denied Plaintiff a meaningful opportunity to be heard.  As shown

below, Referee Clysdale's conduct was so highly prejudicial, unlawful and beyond the confines

of the law that the entire *Schaefer v. Fredin, Middlecamp v. Fredin and Fredin v. Middlecamp*

proceeding is constitutionally deficient.

99.     The clear impetus and motivation behind Referee Clysdale's animus towards

Plaintiff and her bad faith retaliatory conduct was the Court of Appeals action filed by Plaintiff

against her close friend and colleague Referee James Street and the one or two Facebook posts

which criticized their conduct made available by Defendants through legal filings.  Rather than

approaching her assignment to *Schaefer v. Fredin and Middlecamp v. Fredin* as a proverbial

clean slate as the vast majority of other judicial officers would, Referee Clysdale was determined

to dwell and distort the prior proceedings in the case in order to discredit Plaintiff's allegations

against Referee Street in the Court of Appeals matter. Indeed, from taking over the case(s) to the

issuance of her *Schaefer v. Fredin* decision on November 17, 2016, Referee Clysdale's

statements on-the-record, her questioning of Plaintiff during trial and her written decisions

illustrate that she was overtly obsessed with thwarting Plaintiff's meaningful access to the courts

and determined to interfere with and undermine Plaintiff's position in that litigation through her

rulings in *Schaefer v. Fredin and Middlecamp v. Fredin*. Moreover, Referee Clysdale's behavior

on the bench throughout *Schaefer v. Fredin* and *Middlecamp v. Fredin* made it apparent that

Referee Clysdale sought to discredit, disparage, financially cripple and attack Plaintiff's ability

to practice his career to retaliate against Plaintiff for exercising his right to petition in the Court

of Appeals against Referee Street and exercise of his legitimate First Amendment rights. At no

point did Referee Clysdale even seem the slightest bit interested in actually fulfilling her role of

determining the best interests of the parties at issue in the proceeding.

100.    Referee Clysdale's first mention of the Court of Appeals action took place at the

*Middlecamp v. Fredin* trial before her on September 21, 2017. At that hearing, Referee Clysdale

mocked and disparaged Plaintiff for calling the Appellate decision a "tabloid opinion". In doing

so, Referee Clysdale improperly and needlessly took the opportunity to attack Plaintiff for his

statements towards and allegations against Hon. Judge Kevin G. Ross. Specifically, Referee

Clysdale stated:

> The Court: (rolling eyes and screaming) "What did you call that? A tabloid
> opinion?"

(*See* September 21, 2017 Transcript.) Of course, Referee Clysdale failed to mention the

discourteous attacks Judge Ross directed at Plaintiff that forced Plaintiff to lose his job or the fact

that Judge Ross was caught misrepresenting the facts of the case to the extent that it spurned

prejudicial and false sordid media coverage. Moreover, Referee Clysdale's attack on Plaintiff at

the September 21st, 2017 hearing was not only inappropriate, but it was unlawful in light of the fact that she refused to allow Plaintiff to speak and enabled City Attorney Middlecamp breaching the Rules of Professional Conduct by withholding subpoena evidence and using her professional role prejudicially to benefit her personal media platform and solicit law enforcement actions to settle personal vendettas. Unfortunately, this was merely the fourth or fifth instance of a common tactic Referee Clysdale employed to manufacture and fabricate findings against Plaintiff throughout her tenure presiding over *Schaefer v. Fredin and Middlecamp v. Fredin.*

101.    The October 2nd, 2017 order was illustrative of Referee Clysdale's obsession with defending City Attorney Middlecamp and discrediting Plaintiff. If anything, Referee Clysdale's October 2nd, 2017 Order demonstrated nothing but her total disdain and predisposition against Plaintiff. Moreover, Referee Clysdale's representation of City Attorney Middlecamp in her orders concerning Plaintiff were outright misrepresentations as Plaintiff filed proper motions and was both physically present and prepared to prosecute the *Fredin v. Middlecamp* trial.

102.    Referee Clysdale's attacks on Plaintiff and his Court of Appeals, federal action and free speech became more direct as the case progressed. In her October 2nd, 2017 Decision – which Referee Clysdale went out of her way not only to selectively quote Plaintiff's statements at the September 21st, 2017 hearing and the appeal in the Court of Appeals action but saw fit to unethically inject her personal opinion as to the merits of the Court of Appeals action to tacitly discredit Plaintiff's allegations against City Attorney Middlecamp. Specifically, Referee Clysdale wrote in the final Order:

> Prior to a hearing in this matter, the parties had not met in person. In early January 2016, Petitioner, through her anonymous online Twitter account @CardsAgstHrsmt, posted a tweet linking to a Minnesota Court of Appeals opinion in which Respondent was a party.

(*62-HR-CV-17-233 Final Order.*)  City Attorney Middlecamp's public statements and opinions

concerning the Court of Appeals action were unnecessary and wildly prejudicial.  Even more

important, however, her statements were a clear ethical violation in breach of the Professional

Responsibility Rules.  *See* Professional Responsibility Rules 3.6 ("A lawyer ... shall not make an

extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by

means of public communication and will have a substantial likelihood of materially prejudicing

an adjudicative proceeding in the matter.")

103.    Referee Clysdale's use of *Miller v. Fredin* as a means to defend City Attorney

Middlecamp became even more extreme when written in her final order.  Moreover, the passage

illustrates the nonsensical nature of Referee Clysdale's ruling that were clearly intended to

smear, discredit and harass Plaintiff.

104.    In rendering the *Middlecamp v. Fredin* Prior Restraint Decision, Referee Clysdale

was not content to simply sanction Plaintiff for exercising his rights to legal redress and

legitimate First Amendment speech.  Instead, illustrative of Referee Clysdale's retaliatory intent

to turn *Middlecamp v. Fredin* into a character assassination of Plaintiff and to strip Plaintiff of

his livelihood and career, Referee Clysdale violated well established precedent, statute, federal,

and state constitutions and court rules by publishing the Decision imposing Prior Restraint

eliminating his ability to speak about City Attorney Middlecamp's misconduct without notice or

affording him a meaningful opportunity to be heard.

**8. Other:** Writings or other communications by Respondent which are made available for public hearing or viewing and which contain addresses, telephone numbers, photographs or any other form of information by which a reader may contact, identify or locate Petitioner are acts of harassment and are prohibited by this order. Any communications made by Respondent under an identity or auspices other than his true name and which refer to Petitioner are acts of harassment and are prohibited regardless of the truth or falsity of any statement made about Petitioner.

*(See Middlecamp. v. Fredin Final Order.)*

105.    Throughout the Prior Restraint Decision, Referee Clysdale deliberately

misrepresented the facts in the record and intentionally fabricated factual findings adverse to

Plaintiff.  It is apparent these fabricated findings were contrived by Referee Clysdale in an effort

to publicly taint Plaintiff's reputation, irreparably harm Plaintiff's livelihood and prejudice

Plaintiff throughout the remainder of the proceeding in retaliation for Plaintiff's criticism of her

conduct.  Indeed, Referee Clysdale propensity for untruthfulness and the sheer volume of

demonstrable fabrications in the Prior Restraint Decision was staggering and abusive as

illustrated by Plaintiff's attached Complaint, which contains evidence from the record verifying

Referee Clysdale deliberate misrepresentations and fabrications to conceal City Attorney

Middlecamp's misconduct and to retaliate against Plaintiff for his legitimate First Amendment

criticism.  In other words, Referee Clysdale went out of her way to block any legal redress and

thwart Plaintiff's access to the court system by limiting Plaintiff's speech unlawfully.

D.  The January 4th, 2018 Contempt Hearing and Notice to Remove

106.    Referee Clysdale took the incredibly inappropriate step of granting a contempt

hearing over City Attorney Middlecamp's complaints that her address was contained in legal

documents available online including *Middlecamp v. Fredin*, United States District Court of

Minnesota, Case No: 17-cv-03058.  During the hearing, City Attorney Middlecamp singled out

the Plaintiff by claiming that she was unable to personally serve her contempt motions on his

address.  In retaliation, City Attorney Middlecamp asked the Court to verify Plaintiff's address.

In other words, City Attorney Middlecamp was collaterally using the Court's process to block a

federal lawsuit and stalk the Plaintiff as will be described in greater detail *infra*.  Furthermore,

Referee Clysdale refused to address Plaintiff's Motion to Dismiss and failed to force written

opposition.  After the hearing ended, Referee Clysdale said "please wait in the hallway for

orders." In a direct bid to thwart Plaintiff's access to the court system, Referee Clysdale would soon direct his unlawful detainment.

107. Approximately one or two minutes after exiting the courtroom, Officer Yang exited the courtroom and approached Plaintiff. Officer Yang inquired as to whether Plaintiff intended to stay in the hallway or whether he was going to leave the courthouse. Plaintiff responded the he intended to remain in the hallway with his family and fiancé until the proceeding concluded and Referee Clysdale's order was readied.

108. Approximately one minute later, Plaintiff's parties (his family and fiancé) remained in the hallway adjacent to the courtroom door to discuss the proceedings awaiting Referee Clysdale's orders.

109. Approximately thirty seconds later, Officer Yang approached Plaintiff again claiming that while exiting through the courtroom door City Attorney Middlecamp overheard Plaintiff speaking with his family and fiancé. Plaintiff told his fiancé that he believed City Attorney Middlecamp asked for an address verification to raid his house with a swat team. He further told Plaintiff to stop speaking in any fashion by saying "knock it off". Approximately one minute later, Officer Yang entered the Courtroom and approached Referee Clysdale to discuss the proceeding. Plaintiff was then approached for a third time by Officer Yang and was informed by him that Referee Clysdale had directed that Plaintiff be returned to the courtroom.

110. Immediately thereafter, Officer Yang shoved Plaintiff in the back causing him to stumble forward. Officer Yang stated to Plaintiff: "Come with me." He then grabbed and twisted Plaintiff's left arm with violent force and pulled Plaintiff to the front of the courtroom door. At no time did Plaintiff resist. In compliance with Officer Yang's directive, Plaintiff returned to the courtroom shortly after conferring with his family and fiancé.

111.     Upon returning to the courtroom, Plaintiff was perp walked while handcuffed to maximize his humiliation in front of courtroom staff.  At this point, Referee Clysdale was not present in the courtroom.  However, she opened the door to her robing room behind the bench and her chair was still spinning as if she just exited the courtroom seconds earlier.  He then continued to grab and twist Plaintiff's left arm with violent force and pulled Plaintiff to the front of the courtroom near the judge's podium and door to the jury room/hallway adjacent to the courtroom (the "side hallway").  At no time did Plaintiff resist or say anything to Officer Yang.  Officer Yang, however, mentioned that he was detaining Plaintiff because "Referee Clysdale directed him" presumably weeks or months earlier and confirmed upon Officer Yang's reentry into the Courtroom as described above in paragraph 98.

112.     Officer Yang stopped at the door near the jury box and opened it.  Once it was opened, Officer Yang pushed Plaintiff through the door into the side hallway, which is a very small contained area.  Officer Yang followed Plaintiff through the door, which he shut and locked behind him.

113.     Officer Yang then proceeded to push Plaintiff up against the wall and into the small cell and press his hand against Plaintiff's chest restraining him against the wall.  At no time did Plaintiff resist.  During this time, Officer Yang refused to permit Plaintiff to leave the side hallway cell and kept his hand continuously pressed against Plaintiff's chest while tightening his handcuffs.  While Officer Yang detained Plaintiff in the side hallway cell against Plaintiff's will, Officer Yang refused Plaintiff's repeated requests that Officer Yang remove his handcuffs from Plaintiff's wrists and that Plaintiff be permitted to leave the side hallway.  Officer Yang also refused Plaintiff's multiple requests that he be permitted to use his cellphone or speak with his counsel.

114.    In total, Officer Yang detained Plaintiff in the side hallway cell for approximately twenty minutes keeping Plaintiff pinned against the wall and pressing his handcuffs dangerously tightened the entire time.  Officer Katz then unlocked the door and allowed Plaintiff into the side hallway.  Upon Officer Yang opening the door, Referee Clysdale was still in the courtroom and was observed obtaining information about Plaintiff.  Officer Yang refused to allow Plaintiff to leave through the normal hallway and elevators and instead escorted Plaintiff and down several flights of stairs and out of the back of the courthouse.  As a result of Officer Yang's contact and physical restraint, Plaintiff suffered bruising and swelling to his hip, ribs and arm as well as large cuts to his elbow.

115.    Upon information and belief, Referee Clysdale and Officer Yang engaged in a discussion behind closed doors in the robing room or earlier.  Referee Clysdale and Officer Yang routinely exited the courthouse and/or robing room together, where Referee Clysdale pointed her finger at Plaintiff while speaking with Officer Yang.  After review of Officer Yang's police report, he corroborated that he was directed by Referee Clysdale stating "I then stepped into the Courtroom to confirm with Referee Clysdale and she confirmed it."  (*See* Nquoua Yang Narrative RCCTS 18500031.)

116.    Based on Referee Clysdale's bizarre behavior as well as Plaintiff's observations of Referee Clysdale's interactions with Officer Yang, Plaintiff is of the belief that Officer Yang acted to physically contact and restrain Plaintiff at the direction and behest of Referee Clysdale. Indeed, there was no reason or justification for Officer Yang to confine Plaintiff in the tiny side hallway cell.  Plaintiff believes that the physical attack was orchestrated as a show of force and an act of retaliation by Referee Clysdale for Plaintiff's notice to remove, filing a federal

complaint in *Fredin v. Middlecamp* and further attacks to terrorize him for making any speech whatsoever.

117.    It should be noted that during the course of the matter, Plaintiff learned that at least two other litigants who expressed grave concern over Referee Clysdale's behavior in other cases.  The facts of those cases bear striking resemblance to what occurred to Plaintiff at the January 4, 2017 hearing in *Middlecamp v. Fredin*.  Even more astonishing, however, was the position that Referee Clysdale and Officer Yang took with respect to Plaintiff's claims.  According to the Ramsey County Jail and the Saint Paul City Attorney's Office during initial matters in the proceeding that the entire incident "never happened" in an apparent attempt to cover-up the whole incident.

### E.   The January 8th Notice to Remove Appeal Before Chief Judge John Guthmann

118.    After Referee Clysdale was effectively removed from the case after the January 4th, 2018 incident just two weeks after Plaintiff served a notice to remove the case was transferred to Chief Judge John Guthmann to review on January 8th, 2017 under highly irregular circumstances.  The litany of abuses and retaliation by Referee Clysdale was corroborated by opposing counsel.  Chief Judge John Guthmann attempted to cover-up the incident by refusing to grant the official notice to remove.  Rather, transferring the case informally to any open judicial officer as a way to insulate and protect Referee Clysdale from future judicial complaints.

### F.   *The February 13th, 2018 Contempt Trial in Middlecamp v. Fredin*

116.    *Middlecamp v. Fredin* was transferred to Judge Teresa Warner in January, 2018 (with the first appearance being February 13, 2018) under highly irregular circumstances. *Middlecamp v. Fredin* was one of the first, if not the first, case transferred from Referee Clysdale's docket to Judge Warner.

117.     When Judge Warner took over *Middlecamp v. Fredin*, it was apparent that she

had an absolute disregard for the best interests of the Plaintiff at the center of the dispute. Of

course, Plaintiff was again refused opportunity to enter evidence in his defense or even fully

question witnesses or discern the facts of the case.  In fact, Judge Warner flat-out refused to

correct the Prior Restraint order unlawfully restricting Plaintiff's speech by making on-the-

record statements.  At the end of the hearing, Plaintiff asked one question "Can you please lift

Prior Restraint?" and Judge Warner replied "No." (*See* February 13[th], Transcript.)  A singular

motivation permeated through every decision and every statement made by this court.  That

motivation being that they wanted to ensure that Plaintiff was destroyed, and his livelihood

upended by any and all means at their disposal in retaliation for Plaintiff's suit against City

Attorney Middlecamp and his criticism of their actions.  Unfortunately, Judge Warner continued

perverted the *Middlecamp v. Fredin* proceeding and turned it into an unconstitutional sideshow

and Drumhead proceeding in order to attempt to accomplish this goal.  Here, Judge Warner once

again found a way to toss Plaintiff's pre-trial Motion in Limine and failed to hear his Motion to

Dismiss.

118.     During the initial portion of the evidentiary hearing, City Attorney Middlecamp

failed to stipulate or even remain knowledgeable about purge conditions.  As a result, she

stumbled through the *Hoppe* hearing to determine what legal relief she wanted.  Astonishingly,

she said (out of the blue) that she wanted a fifty (50) year HRO against Plaintiff.  Moreover, the

next words out of her mouth were that her address was contained in the Plaintiff's federal

complaint and that she considered the complaint "harassment".  (See February 13th, Transcript.)

119.     Despite allowing City Attorney Middlecamp's affidavit to come into evidence

without an authenticating witness, Judge Warner excluded Plaintiff's website screenshot

evidence and logs conclusively illustrating that City Attorney Middlecamp's affidavit were altered.

120.   On December 19, 2017, City Attorney Middlecamp finally introduced her version of the whistle blower website into evidence. It was discovered shortly after the evidentiary hearing, however that the version of the December 19, 2013 "whistleblower" website that City Attorney Middlecamp gave to the court differed from the one she introduced into evidence. Again, they were not screenshots, but rather computer printouts made to look like websites. The December 19, 2017 "whistleblower" website was among several pages she introduced, which neither Plaintiff nor his counsel had an opportunity to examine in detail prior to the close of trial due to the unlawful conspiracy to file three contempt hearings and multiple other proceedings all at once by Defendant Schaefer, Defendant Miller, and City Attorney Middlecamp. It was discovered shortly after the hearing, however that the version of the December 19, 2017 "whistleblower" website that City Attorney Middlecamp gave to the court differed from the one she originally introduced into evidence with her December 19th, 2017 affidavit.

121.   In the original version, the photos on the printout immediately below the text is different in that it is without any meta data and was much lighter. This evidence demonstrated that City Attorney Middlecamp printouts were mutable and altered. In contrast, the websites on Plaintiff's exhibit list, which was inspected by everyone in the courtroom, could not have been altered without cracking various encryption systems for web domains, which the FBI and DOJ have been unable to do.[11] It was later learned that City Attorney Middlecamp apparently tried to

---

[11]   *See*   http://www.tehnologyreview.com/428477/the-iphone-has-passed-a-key-security-threshold/ (article from 2012 reporting the significant difficulties law enforcement personnel encountered performing forensic evaluations of iPads and other Apple products, including a comment from a Department of Justice official that whenever an examined product has an encrypted hard drive, "you're done")

reopen the record on Friday February 16th, 2018 by filing an admittedly bone chilling and creepy affidavit from her husband David Middlecamp.

122.   As an apparent retaliation for including City Attorney Middlecamp's address in a federal complaint, Mr. Middlecamp who is not an expert witness, claimed to be, even though he would not be able to be retained as an expert on his wife's case, and tracked Plaintiff's fiancé's home address in Wisconsin, and took her photos (and that of a child with her) to unlawfully purport that the "whistle blower" website was somehow created by her. Of course, there was no technical evidence whatsoever to support this. Instead, Mr. Middlecamp relied on nonsense and deliberate distortions of the record to justify his fantastical and science fictional finding. For instance, Mr. Middlecamp nonsensically included Plaintiff's fiancé's home GPS coordinates and photos of Plaintiff's mother in the filing. The record reveals that Mr. Middlecamp distorted evidence in order to goad him once again after an evidentiary hearing. This is not the first time City Attorney Middlecamp has tried to withhold exculpatory evidence either, unfortunately. As described above, City Attorney Middlecamp failed to disclose critical subpoena evidence during the original *Middlecamp v. Fredin* trial. Even worse, she made unequivocal lies by claiming she "just found" the evidence following the hearing.

123.   Shortly after, Plaintiff shared the affidavit with his fiancé. His fiancé was both terrified, fearful, and totally creeped out that Mr. Middlecamp would publish her home address, photos of her home, photos of her with a child, and other data within a public state court filing. In other words, despite the fact his fiancé has never been involved other than coming to one hearing as a support person, Mr. Middlecamp targeted her, by distorting evidence, and unlawfully stole her photos.

124.     Approximately one hour before filing the affidavit, her attorney Michael P. Boulette suspiciously withdrew himself from the litigation.  Here, Mr. Boulette tacitly acknowledged that City Attorney Middlecamp was filing exculpatory evidence after the evidentiary hearing.

125.     It should be further noted that Mr. Middlecamp brings a backpack to every hearing.  In his back pack he carries audio visual and recording equipment.  The top of his backpack is always slightly open, and he is known for working with his wife where they both routinely record conversations in order to humiliate their targets.  Upon information and belief, Mr. Middlecamp has recorded proceedings.  In other words, Mr. Middlecamp retaliated against Plaintiff to thwart Plaintiff's access to the court.

### G.   _The Common Conspiracy Among City Attorney Middlecamp, Defendant Miller, and Defendant Schaefer_

126.     As shown above, Defendant Miller, Defendant Schaefer, and City Attorney Middlecamp have been in constant backchannel contact with numerous individuals concerning Plaintiff.  These individuals include Sgt. David McCabe, Joshua Post Lee, Karmen McQuitty, Michael P. Boulette, and Peter Mayer just to name a few examples of third parties that they have communicated with during these proceedings.  Indeed, the above discussions demonstrates that these conversations have yielded Defendant Miller, Defendant Schaefer, and City Attorney Middlecamp numerous documents, including sharing filings and defendants have attempted to use against Plaintiff.  Pursuant to Professional Responsibility Rule 3.4, the parties are required to turn over these communications and any documents that they have received concerning its investigation and prosecution of Plaintiff.

> unlawfully obstruct another party's access to evidence or unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act;

(*See* Minnesota Professional Responsibility Rule 3.4.)

To date, Defendant Schaefer, Defendant Miller, City Attorney Middlecamp, and their respective

attorneys have steadfastly withheld this required disclosure from Plaintiff in violation of

Professional Rules of Responsibility.  Plaintiff again believes that disclosure of these

communications and documents will reveal exculpatory and/or mitigating information as well as

evidence to support Plaintiff's contention that Defendants have engaged in bad faith, vindictive

prosecution of Plaintiff.

127.   These apparent and continuous backchannel communications coupled with

Defendant Miller, Defendant Schaefer, and City Attorney Middlecamp's refusal to provide

Plaintiff required disclosure raises serious questions suggesting that their prosecution of Plaintiff

is for vindictive purposes.  This is particularly so in light of the apparent evidence that Referee

Clysdale fabricated findings adverse to the Plaintiff that Defendants continue to rely on in

prosecuting Plaintiff as well as Defendant's knowledge of apparent acts of attorney misconduct

by City Attorney Middlecamp discussed *supra*.  Indeed, Plaintiff believes that Defendants

improperly and unlawfully acted in collusion with City Attorney Middlecamp, Defendant Miller,

Defendant Schaefer, Sgt. McCabe, and Referee Clysdale to vindictively prosecute Plaintiff in an

effort to cover-up their own misconduct and in retaliation against Plaintiff for exercising his right

to petition against these individuals.

128.   Indeed, Plaintiff has uncovered evidence that confirms these improper

backchannel communications between City Attorney Middlecamp and Plaintiff's adversaries in

*Miller v. Fredin* and *Schaefer v. Fredin*.  In fact, Plaintiff has discovered these communications

have gone much further than simply exchanging court filings.  Rather City Attorney

Middlecamp, Defendant Miller, and Defendant Schaefer have been in constant contact

apparently colluding to orchestrate the imposition of vindictive collateral proceedings on

Plaintiff.  On April 10st, 2017, a honeypot website was setup with the domain

http://www.lindseymiddlecamp.com.  Within days of City Attorney Middlecamp learning of this

website, IP logs confirm that Defendant Schaefer was viewing the website from State College,

Pennsylvania.







| City ⓘ | Acquisition | | | Behavior | | | Conversions | |
|---|---|---|---|---|---|---|---|---|
| | Sessions ⓘ ↓ | % New Sessions ⓘ | New Users ⓘ | Bounce Rate ⓘ | Pages / Session ⓘ | Avg. Session Duration ⓘ | Goal Conversion Rate ⓘ | Goal Completions ⓘ |
| | 8 % of Total: 6.40% (125) | 37.50% Avg for View: 68.80% (-45.49%) | 3 % of Total: 3.49% (86) | 100.00% Avg for View: 88.00% (13.64%) | 1.00 Avg for View: 1.13 (-11.35%) | 00:00:00 Avg for View: 00:00:51 (-100.00%) | 0.00% Avg for View: 0.00% (0.00%) | 0 % of Total: 0.00% (0) |
| 1.   State College | 8 (100.00%) | 37.50% | 3 (100.00%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0  (0.00%) |

(*See* Ex. 8. Photos of IP Logs.)  This confirms that City Attorney Middlecamp has an improper direct line to Defendant Schaefer about Plaintiff outside the normal legal process.

129.    This direct line of communication is extremely troubling.  During the *Schaefer v. Fredin* proceeding, Defendant Schaefer was found to have made materially false statements to the court in an effort to obtain a HRO in addition to repeated discourteous statements to the Plaintiff.  Furthermore, Defendant Schaefer testified during the *Schaefer v. Fredin* trial that a "local woman" repeatedly instructed her not to comply with a court-ordered deposition and requests for admissions requiring her to produce digital copies of her prior knowledge of "local women" and any police reports, the suppressed critical evidence in the trial discussed *supra*. (*See* November 17th, 2016 Trans.)  And, the Saint Paul Police departments subpoenas found that

Defendant Schaefer "fabricated" police reports from telemarketers, had attempted to engage in ex-parte communication with the media, and had unlawfully been coached by City Attorney Middlecamp and Defendant Schaefer to restrict evidence. Despite these clear violations of the Rules of Professional Conduct, City Attorney Middlecamp has never been investigated for attorney misconduct by the Professional Responsibility Board run by Susan Humiston. The fact the Professional Responsibility Board would ignore years of unethical behavior on her part, including allegations of posting naked photos of men without their consent to thousands of people, repeatedly withholding exculpatory evidence, using her law license to harass litigants with multiple collateral proceedings, and disseminate widespread prejudicial and stigmatizing false media coverage in an effort to prosecute Plaintiff again lends credence to the assertion that the Professional Responsibility Board, Susan Humiston, and City Attorney Middlecamp have acted vindictively and in bad faith in enabling prosecution against Plaintiff.

130.

### H. The Saint Paul City Attorney's Office Misconduct

131. After Plaintiff secured bail on January 5th, 2018, it immediately became apparent as the case progressed that Deputy Yang and the City Attorney's Office had conducted a one-sided investigation, were hiding evidence, and that they misrepresented the facts in charging Plaintiff. First and foremost, it was learned that officer Yang never even attempted to interview Plaintiff's fiancé or family. Similarly, Officer Yang refused to disclose why he was attempting to overhear the conversation between Plaintiff and his parties. Likewise, he refused to answer why City Attorney Middlecamp and her husband were deliberately trying to eaves drop on Plaintiff's conversation. And, never attempted to take any other witness statements despite their being literally hundreds of people there.

132.    Most problematic was the purported statement that Officer Yang went into the Courtroom where he was ultimately directed by Referee Clysdale to arrest Plaintiff.  In fact, Officer Yang stated gratuitously "I then stepped into the court room to confirm with Referee Clysdale … and with she confirmed that (sic)."  Indeed, both witness statements obtained by Plaintiff also detail how Officer Yang needed directed from Referee Clysdale and attempted to deliberately eavesdrop on Plaintiff's conversation.

I then stepped into the court room to confirm with Referee Clysdale about the current HRO and with she confirmed that

133.    Perhaps even more troubling, the Saint Paul Police and Saint Paul City Attorney's Office and Sgt. McCabe seemingly only conduct one-sided investigations and have enabled a long parade of harassment, stalking, and even legal process abuse by Defendants without end. This is apparent in each case discussed above.

134.    What is even more troubling is the fact that the Referee Clysdale, Saint Paul City Attorney's Office and Sgt. McCabe has suppressed City Attorney Middlecamp's misconduct that actually shows that she victimized Plaintiff.  Furthermore, Referee Clysdale, Saint Paul City Attorney's Office, and Sgt. McCabe were aware of @CardsAgstHrsmt, law enforcement leaks, and that Defendant Miller significantly embellished her social media "harassment" and/or "stalking" story to incite a collateral attack using City Attorney Middlecamp, Defendant Schaefer, and enabled vis-à-vis Referee Clysdale's legal process and Sgt. David McCabe's raids.

135.    Upon information and belief, the City Attorney's Office and Sgt. McCabe are in possession of large numbers of knowingly false police reports and a plethora of other evidence indicating a stalking campaign against Plaintiff.  Furthermore, upon information and belief, Defendants are in possession of exculpatory evidence that reveals Plaintiff's social media posting

was not direct or indirect contact and that they had colluded together in order to plan a media campaign to bring frivolous criminal charges.

136. Simply put, the intent to perpetuate proceedings against Plaintiff including criminal proceedings only further serves to illustrate the common theme *Miller v. Fredin* and all the other collateral proceedings discussed in this Complaint. That is that these bad faith actions – including the criminal proceeding – were brought, at least in part, or manipulated as a means of retaliating against Plaintiff for filing an Appeal in Miller v. Fredin and exercising his rights to legal redress and legitimate First Amendment rights to speech. These facts unquestionably establish a pattern of retaliatory, bad faith litigation Plaintiff has been subjected to at the hands of the Defendants, Saint Paul City Attorney's Office, and the Minnesota Judicial Branch.

137. Without question, Defendant Miller and the others participating in this scheme retaliate against Plaintiff have financially crippled Plaintiff. Plaintiff has been forced to expend thousands upon thousands of dollars in legal fees and costs the collateral proceedings Defendant Miller has instigated against Plaintiff. This was no different in the criminal proceeding. Plaintiff was not only forced to hire counsel and post bail, but also hire related professionals to investigate matters. A trial in the criminal proceeding will cost no less than $40,000 in legal fees and costs, which Plaintiff would not be able to afford.

138. As the facts set forth above demonstrate, Defendant Miller, City Attorney Middlecamp, and Defendant Schaefer engaged in tortious conduct in connection with the instigation of the criminal charges against Plaintiff. First and foremost, all three abused process. Defendant Miller used City Attorney Middlecamp's public position and influence as an Assistant City Attorney to instigate criminal charges against Plaintiff in an effort to further harass and stigmatize him. City Attorney Middlecamp also instigated the charges for the apparent collateral

purpose of avoiding facing a pending civil suit filed by Plaintiff concerning her

@CardsAgstHrsmt and media tabloid coverage against Plaintiff, to retaliate against Plaintiff for

filing civil litigation in the United States District Court of Minnesota. She further instigated the

charges and sought a harassment restraining order in an effort to retaliate against the Plaintiff for

his social media campaign and whistleblower websites exercising legitimate First Amendment

free speech critical of a government official. She further instigated the charges to serve her

harassment restraining order during a swat raid of his personal home in Hudson Wisconsin in

further efforts to harass and terrorize the Plaintiff.

139.    Furthermore, Defendant Miller, City Attorney Middlecamp, and Defendant

Schaefer tortuously interfered with Plaintiff's employment opportunities. Upon information and

belief, these three were aware that Plaintiff worked at *Trane* and various other local

organizations and acted in concert to with each other to prevent him from engaging in

employment opportunities. Defendant Schaefer further committed fraud. As mentioned above,

Defendant Schaefer acted in concert with City Attorney Middlecamp and Defendant Miller to

make knowingly deliberately false statements to investigators in an effort to instigate criminal

charges against Plaintiff and to impose Prior Restraint preventing him from exercising legitimate

First Amendment speech.

**COUNT I**
**VIOLATION OF THE FIRSTAND FOURTEENTH AMENDMENTS – FREE**
**EXERCISE OF SPEECH**
(Referee Clysdale, Sgt. McCabe, City Attorney Middlecamp)

140.    Plaintiff Fredin re-alleges and incorporates by reference paragraphs 1-139 of the

Complaint as though fully set forth herein:

141.    Defendant Middlecamp has made false and defamatory statements concerning

Plaintiff Fredin as set forth above in this Complaint.

142.     Defendant Middlecamp's statements are statements of fact and are demonstrably false.

143.     Defendant Middlecamp's defamatory statements accused Plaintiff Fredin of committing a serious crime, i.e. rape, and are therefore defamatory per se.

144.     Defendant Middlecamp has published and continues to publish these false statements to numerous individuals on her Twitter account.

145.     Defendant Middlecamp enjoys no privilege concerning these statements.

146.     As a result of Defendant Middlecamp's defamatory statements and unlawful conduct, Plaintiff Fredin has suffered severe harm and is entitled to actual and punitive damages in an amount to be proven at trial.  Plaintiff Fredin also seeks injunctive relief requiring Defendant Middlecamp to remove the defamatory material and posts from her Twitter account @CardsAgstHrsmt.

## COUNT II
## VIOLATION OF THE FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS – DUE PROCESS
### (Referee Clysdale, Sgt. McCabe, City Attorney Middlecamp)

147.     Plaintiff incorporates by reference paragraphs 1-146 as if fully set forth herein.

148.     By and through their conduct, as described herein, Defendants are liable to Plaintiff under 42 U.S.C. § 1983 for violations, under color of state law, of Plaintiff's constitutional right to be free from any deprivation of liberty without Due Process of Law under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution. As set forth in this Complaint, Defendants have engaged in acts and a continuing pattern of conduct undertaken with the intent to deny Plaintiff Due Process under the law.

149.     Defendants' unlawful actions were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional and civil rights.

150.    As a result of Defendants' ongoing unlawful conduct, Plaintiff has repeatedly been denied a meaningful opportunity to be heard in the Minnesota Judicial Branch as described herein in this Complaint.

151.    As set forth in this Complaint, City Attorney Middlecamp, acting under color of state law, have engaged in acts to unlawfully and constitutionally deny Plaintiff the right to meaningful review by rigging the appeal of the Miller v. Fredin Decision and Middlecamp v. Fredin trial to bring prejudicial media coverage in order to place undue burden on Plaintiff.

152.    By and through their conduct, as described herein in this Complaint, and acting under color of state law, Sgt. McCabe and City Attorney Middlecamp are liable to Plaintiff under 42 U.S.C. § 1983 for the violation of executing an unlawful search and seizure to deprive Plaintiff's right to safety and security and to place further undue burden on Plaintiff depriving him of the financial means to defend himself legally.

153.    By and through their conduct, as described herein in this Complaint, and acting under color of state law, Referee Clysdale is liable to Plaintiff under 42 U.S.C. § 1983 for the violation of Plaintiff's right to meaningful review, right to seek a full and fair hearing and right to fair notice by issuing the November 17th, 2016 and October 2nd, 2017 orders in the *Schaefer v. Fredin* and *Middlecamp v. Fredin* matter finding Plaintiff guilty of harassment without any legal analysis, factual discussion, explanation as to why the Plaintiff was unable to enter evidence and findings as to what purported conducted violated each specific rule of conduct.

116.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered substantial ongoing harm that will continue without intervention from this Court. Consequently, Plaintiff respectfully requests that this Court grant Plaintiff prospective

declaratory relief declaring that Defendants' unlawful actions are unconstitutional and

inconsistent with Due Process. Plaintiff further requests that this Court grant Plaintiff

prospective injunctive relief enjoining Defendants from further infringing upon Plaintiff's

constitutional and civil rights.

## COUNT III
## VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS –
## DISCRIMINATION BASED ON PLAINTIFF'S GENDER
### (Referee Clysdale, City Attorney Middlecamp)

117.    Plaintiff incorporates by reference paragraph 1 through 116 as if fully set forth

herein.

118.    By and through their conduct, as described herein in this Complaint, and acting

under color of state law, Referee Clysdale and City Attorney Middlecamp are liable to Plaintiff

under 42 U.S.C. § 1983 for the violation of Plaintiff's constitutional right to be free from

discrimination based on Plaintiff's gender. As set forth herein in this Complaint, these

Defendants, acting under color of state law, engaged in acts to unlawfully and constitutionally

deny Plaintiff the right to meaningful access to the courts and have engaged in patently

unconstitutional conduct as a result of Plaintiff's gender.

119.    Defendants' unlawful actions were done willfully, knowingly, with malice and

with the specific intent to deprive Plaintiff of his constitutional rights.  As a direct and

proximate result of Defendants' unlawful conduct, Plaintiff has suffered substantial ongoing

harm that will continue without intervention from this Court.

120.    Consequently, Plaintiff respectfully requests that this Court grant Plaintiff

prospective declaratory relief declaring that Defendants' continued pattern of discrimination

against Plaintiff based on his gender be deemed unconstitutional. Plaintiff further requests that

this Court grant Plaintiff prospective injunctive relief enjoining Defendants from further

infringing upon Plaintiff's constitutional and civil rights as a result of his gender. Lastly, as a

direct and proximate result of City Attorney Middlecamp's discriminatory actions in connection

with the so-called @CardsAgstHrsmt victimization of Plaintiff that were extra-judicially

disseminated to the media, Plaintiff has suffered, and will continue to suffer, damages in an

amount to be determined at trial.

## COUNT IV
## VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS – RETALIATION FOR PLAINTIFF'S EXERCISE OF CONSTITUTIONAL RIGHTS
### (Referee Clysdale, Sgt. McCabe, City Attorney Middlecamp)

121.    Plaintiff incorporates by reference paragraph 1 through 120 as if fully set forth

herein.

122.    By and through their conduct, as described herein in this Complaint, and acting

under color of state law, Defendants are liable to Plaintiff under 42 U.S.C. § 1983 for the

violation of Plaintiff's constitutional right to be free from retaliation as a result of Plaintiff

exercising his constitutional right to petition the courts for redress and for exercising his First

Amendment rights to legitimately criticize a public official.

123.    As set forth in this Complaint, Defendants have retaliated against Plaintiff for

exercising his right to petition in the filing of an action in the Minnesota Court of Appeals

against Defendant Miller.  As set forth in this Complaint, Defendants have retaliated against

Plaintiff for exercising his right to petition in the filing of an action in the United States District

Court for Minnesota against City Attorney Middlecamp alleging inter alia defamation.

124.    As set forth in this Complaint, Defendants have retaliated against Plaintiff for

exercising his right to petition in the filing of a civil complaint against City Attorney Middlecamp

in United States District Court of Minnesota alleging inter alia that City Attorney Middlecamp

committed unlawful tortious acts in connection with her @CardsAgstHrsmt Twitter account

targeting = Plaintiff and her dissemination of false content to the *City Pages* tabloid.

125.    As set forth in this Complaint, Defendants have retaliated against Plaintiff for

exercising his First Amendment right to criticize public officials, including but not limited to,

Referee Clysdale, City Attorney Middlecamp, Defendant Miller, Referee James Street, Karmen

McQuitty, and Sgt. McCabe. Defendants' unlawful actions were done willfully, knowingly, with

malice and with the specific intent to deprive Plaintiff of his constitutional rights.  As a direct

and proximate result of Defendants' unlawful conduct, Plaintiff has suffered substantial ongoing

harm that will continue without intervention from this Court. Consequently, Plaintiff respectfully

requests that this Court grant Plaintiff prospective declaratory relief declaring that Defendants'

continued pattern of retaliation against Plaintiff based on the exercise of his constitutional rights

be deemed unconstitutional. Plaintiff further requests that this Court grant Plaintiff prospective

injunctive relief enjoining Defendants from further infringing upon Plaintiff's constitutional and

civil rights as a result of Plaintiff exercising his constitutional rights. Lastly, as a direct and

proximate result of City Attorney Middlecamp, Defendant Miller, and Defendant Schaefer's

discriminatory actions in connection with the so-called @CardsAgstHrsmt and City Pages

tabloid statements that were extra judicially disseminated to the media.

### COUNT V
### VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS – DENIAL OF DUE PROCESS
(Referee Clysdale, Sgt. McCabe, City Attorney Middlecamp)

126.    Plaintiff Fredin re-alleges and incorporates by reference paragraphs 1-125 of the Complaint as though fully set forth herein:

127.    Plaintiff incorporates by reference paragraph 1 through 161 as if fully set forth herein.

128.    By and through his conduct, as described herein in this Complaint, and acting under color of state law, Referee Clysdale is liable to Plaintiff under 42 U.S.C. § 1983 for the violation of Plaintiff's constitutional right to an impartial arbiter/prosecutor and meaningful review of Plaintiff's lawful complaint under the Fifth and Fourteenth Amendments under the Fifth and Fourteenth Amendments of the United States Constitution. As set forth herein in this Complaint, Referee Clysdale, acting under color of state law, engaged in acts to unlawfully and constitutionally deny Plaintiff the right to meaningful review of the January 28th, 2016 Miller v. Fredin Order, November 17, 2016 trial between *Schaefer v. Miller*, and the July 20th, 2017 Trial between Middlecamp v. Fredin, and the September 21st, 2017 trial in Middlecamp v. Fredin. Specifically, Referee Clysdale presided over and/or made ex-parte signing authorities as described in this Complaint. Furthermore, Referee Clysdale engaged in unlawful acts to cover-up City Attorney Middlecamp's misconduct thwarting Plaintiff's constitutional rights. Referee Clysdale's unlawful actions were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights

129.    As a direct and proximate result of Referee Clysdale's unlawful conduct, Plaintiff has suffered substantial ongoing harm that will continue without intervention from this Court. Consequently, Plaintiff respectfully requests that this Court grant Plaintiff prospective declaratory relief declaring that Referee Clysdale's involvement in Plaintiff's various state cases

be deemed unconstitutional. Plaintiff further requests that this Court grant Plaintiff prospective injunctive relief enjoining Referee Clysdale from further infringing upon Plaintiff's constitutional and civil rights with respect to Miller v. Fredin, Schaefer v. Fredin, and Middlecamp v. Fredin.

**COUNT VI**
**VIOLATION OF THE FOURTH, FIFTH AND FOURTEENTH AMENDMENTS –**
**ABUSE OF PROCESS**
(Referee Clysdale, Sgt. McCabe, City Attorney Middlecamp)

130. Plaintiff incorporates by reference paragraph 1 through 129 as if fully set forth herein.

131. By and through their conduct, as described herein in this Complaint, and acting under color of state law, Referee Clysdale, Sgt. McCabe, and City Attorney Middlecamp are liable to Plaintiff under 42 U.S.C. § 1983 for the violation of Plaintiff's constitutional right to be free from court abusive and perverted use of lawful process under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution during the January 4th, 2018 incident, April 28th, 2017 Raid, and the April 14th, 2017 Petition for an HRO to conceal City Attorney Middlecamp's misconduct.

132. Furthermore, by and through their conduct, as described herein in this Complaint, and acting under color of state law, Referee Clysdale is liable to Plaintiff under 42 U.S.C. § 1986 for willfully and/or negligently failing to intervene to stop Officer Yang's unconstitutional acts directed at Plaintiff during the January 4th, 2018 arrest of Plaintiff. Referee Clysdale unlawful actions were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff his constitutional rights. Referee Clysdale is not entitled to absolute immunity for the complained of conduct. As a direct and proximate result of Referee

Clysdale's unlawful actions, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.

133.    Furthermore, by and through their conduct, as described herein in this Complaint, and acting under color of state law, Sgt. McCabe and City Attorney Middlecamp are liable to Plaintiff under 42 U.S.C. § 1986 for willfully and/or maliciously directing unconstitutional acts at Plaintiff during the April 28th, 2017 Raid and arrest of Plaintiff.

134.    Sgt. McCabe and City Attorney Middlecamp's unlawful actions were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff his constitutional rights.  Sgt. McCabe and City Attorney Middlecamp are not entitled to qualified immunity for the complained of conduct.

135.    As a direct and proximate result of their unlawful actions, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.

136.    Furthermore, by and through their conduct, as described herein in this Complaint, and acting under color of state law, City Attorney Middlecamp are liable to Plaintiff under 42 U.S.C. § 1986 for willfully and/or maliciously directing unconstitutional acts at Plaintiff during the January 24th - April 2017 @CardsAgstHrsmt campaign.

137.    City Attorney Middlecamp's unlawful actions were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff his constitutional rights.  City Attorney Middlecamp are not entitled to absolute, prosecutorial, or qualified immunity for the complained of conduct.

138.    As a direct and proximate result of her unlawful actions, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.

## COUNT VII
## VIOLATION OF THE FOURTH, FIFTH AND FOURTEENTH AMENDMENTS – MALICIOUS PROSECUTION
### (Sgt. McCabe, City Attorney Middlecamp)

139.    Plaintiff incorporates by reference paragraph 1 through 138 as if fully set forth herein.

140.    By and through their conduct, as described herein in this Complaint, and acting under color of state law, Sgt. McCabe and City Attorney Middlecamp are liable to Plaintiff under 42 U.S.C. §§ 1983 and 1986 for the violation of Plaintiff's constitutional right to be free from malicious prosecution without probable cause under the Fourth and Fourteenth Amendments of the United States Constitution. Sgt. McCabe and City Attorney Middlecamp denied Plaintiff's rights secured by the Fourth, Fifth and Fourteenth Amendments by making knowingly and malicious baseless allegations of "rape" and "phone and/or text message" claims in *Schaefer v. Fredin* during the investigation of Plaintiff as described herein in this Complaint.  More specifically, Sgt. McCabe and City Attorney Middlecamp conspired and/or acted to maliciously allege assertions of misconduct against Plaintiff without probable and/or reasonable cause in addition to asserting allegations of "rape" and "text message and/or phone calls" that were either unsubstantiated, baseless, and/or proven irrefutably false.

141.    The investigation was resolved in Plaintiff's favor as the Saint Paul Police, Sgt. McCabe and City Attorney Middlecamp never brought formal charges against Plaintiff based on the allegations of "rape" or "harassment via phone and/or text message claims" in *Schaefer v. Fredin* asserted in the investigation of Plaintiff.

142.    Sgt. McCabe and City Attorney Middlecamp's unlawful actions were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff his constitutional rights.

143.    As a direct and proximate result of Sgt. McCabe's and City Attorney Middlecamp's unlawful actions, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.

**COUNT VIII**
**VIOLATION OF THE FOURTH, FIFTH AND FOURTEENTH AMENDMENTS –**
**DEFAMATION STIGMA-PLUS**
(City Attorney Middlecamp)

144.    Plaintiff incorporates by reference paragraph 1 through 143 as if fully set forth herein.  By and through his conduct, as described herein in this Complaint, and acting under color of state law, City Attorney Middlecamp is liable to Plaintiff under 42 U.S.C. § 1983 for the violation of Plaintiff's constitutional right to be free from state-impose reputational harm and deprived of liberty under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution. As set forth herein in this Complaint, City Attorney Middlecamp, acting under color of state law, engaged in extrajudicial conduct by publishing and personally disseminating the January 24th, 2017 decision in Miller v. Fredin to the media and her @CardsAgstHrsmt platform that contained defamatory statements about Plaintiff that have injured his professional reputation and denied him his constitutional rights.

145.    Plaintiff has suffered the requisite "stigma-plus" sufficient to raise a claim under 42 U.S.C. § 1983 as a result of City Attorney Middlecamp's defamatory statements. Specifically, City Attorney Middlecamp's defamatory statements were used against him in the collateral

proceedings initiated by the Saint Paul City Attorney's Office and her own HRO petition.  City

Attorney Middlecamp's defamatory statements were cited in Stephen Christie's July 2017 email

within the State of Minnesota proceeding. Referee Clysdale cited City Attorney Middlecamp's

defamatory statements in recommending an HRO as described in this Complaint. Thus, Plaintiff

has sufficiently alleged a potential "change of status" sufficient to satisfy the "stigma-plus"

requirement.

146.    City Attorney Middlecamp's unlawful actions were done willfully, knowingly,

with malice and with the specific intent to deprive Plaintiff his constitutional rights. City

Attorney Middlecamp is not entitled to qualified immunity or absolute immunity for the

complained of conduct.

147.    As a direct and proximate result of City Attorney Middlecamp's unlawful actions,

Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at

trial.

### COUNT IX
### VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS – ASSAULT
(Sgt. McCabe, Referee Clysdale)

148.    Plaintiff incorporates by reference paragraph 1 through 147 as if fully set forth

herein.

149.    By and through his conduct, as described herein in this Complaint, and acting

under color of state law, Sgt. McCabe is liable to Plaintiff under 42 U.S.C. § 1983 for the

violation of Plaintiff's constitutional right to be free from unreasonable force and assault under

the Fifth and Fourteenth Amendments of the United States Constitution. As set forth in this

Complaint, Sgt. McCabe denied Plaintiff's constitutional rights by directing, orchestrating

and/or conspiring to orchestrate an assault on Plaintiff during the execution of an April 28th, 2017 swat raid of Plaintiff's home in Hudson, Wisconsin.

150.    Sgt. McCabe's unlawful actions were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights. Sgt. McCabe is not entitled to qualified immunity for the complained of conduct.

151.    By and through her conduct, as described herein in this Complaint, and acting under color of state law, Referee Clysdale is liable to Plaintiff under 42 U.S.C. § 1983 for the violation of Plaintiff's constitutional right to be free from unreasonable force and assault under the Fifth and Fourteenth Amendments of the United States Constitution. As set forth in this Complaint, Referee Clysdale denied Plaintiff's constitutional rights by directing, orchestrating and/or conspiring to orchestrate an assault on Plaintiff after the conclusion of an January 4th, 2017 hearing in *Middlecamp v. Fredin.*

152.    Referee Clysdale's unlawful actions were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights. Referee Clysdale is not entitled to qualified immunity or absolute immunity for the complained of conduct.

153.    As a direct and proximate result of Referee Clysdale's and Sgt. McCabe's unlawful actions, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.

## COUNT X
## VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS – FALSE ARREST / FALSE IMPRISONMENT
### (Sgt. McCabe, Referee Clysdale)

154.    Plaintiff incorporates by reference paragraph 1 through 153 as if fully set forth herein.  By and through her conduct, as described herein, and acting under color of state law,

Referee Clysdale is liable to plaintiff under 42 U.S.C. § 1983 for the violation of Plaintiff's

constitutional right to be free from false arrest and unlawful detainment under the Fourth and

Fourteenth Amendments of the United States Constitution. Referee Clysdale denied Plaintiff's

rights secured by the Fourth and Fourteenth Amendments by orchestrating and/or conspiring

to orchestrate Plaintiff's unlawful detention and false arrest without reasonable suspicion or

probable cause at the January 4th, 2017 hearing in *Middlecamp v. Fredin* as described in this

Complaint.

155.    Referee Clysdale and Sgt. McCabe's unlawful actions were done willfully,

knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional

rights. Referee Clysdale and Sgt. McCabe's is not entitled to qualified immunity or absolute

immunity for the complained of conduct.

156.    As a direct and proximate result of Referee Clysdale and Sgt. McCabe's unlawful

actions, Plaintiff has suffered, and will continue to suffer, damages in an amount to be

determined at trial.

### COUNT XI
### VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS –
### UNLAWFUL SEARCH AND SEIZURE
### (Sgt. McCabe)

157.    Plaintiff incorporates by reference paragraph 1 through 156 as if fully set forth

herein. By and through their conduct, as described herein, and acting under color of state law

to deprive Plaintiff of his right to be free from unreasonable searches and seizures without

reasonable suspicion or probable cause as required by the Fourth and Fourteenth

Amendments, Sgt. McCabe is liable under 42 U.S.C. § 1983. Sgt. McCabe denied Plaintiff's rights

secured by the Fourth and Fourteenth Amendments by directing and attempting to subject and

subjecting Plaintiff to an unreasonable search and seizure without reasonable suspicion or

probable cause on April 28th, 2017 during a swat raid of Plaintiff's home in Hudson, Wisconsin.

158.    Sgt. McCabe's unlawful actions in directing the unlawful search and confiscation

of Plaintiff's digital property were done willfully, knowingly, with malice and with the specific

intent to deprive Plaintiff of his constitutional rights.

159.    As a direct and proximate result of Sgt. McCabe's unlawful actions, Plaintiff has

suffered, and will continue to suffer, damages in an amount to be determined at trial.

**COUNT XII**
**VIOLATION OF THE FOURTH, FIFTH AND FOURTEENTH AMENDMENTS –**
**ABUSE OF PROCESS**
(Referee Clysdale, City Attorney Middlecamp, Sgt. McCabe)

160.    Plaintiff incorporates by reference paragraph 1 through 159 as if fully set forth

herein.

161.    By and through their conduct, as described herein in this Complaint, and acting

under color of state law, Referee Clysdale, City Attorney Middlecamp and Sgt. McCabe are

liable to Plaintiff under 42 U.S.C. § 1983 for the violation of Plaintiff's constitutional right to be

free from court abusive and perverted use of lawful process under the Fourth, Fifth and

Fourteenth Amendments of the United States Constitution.

162.    Referee Clysdale, City Attorney Middlecamp and Sgt. McCabe's unlawful actions

were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his

constitutional rights.

**COUNT XIII**
**VIOLATION OF THE FOURTH, FIFTH AND FOURTEENTH AMENDMENTS –**
**BRADY VIOLATIONS**
(City Attorney Middlecamp, Sgt. McCabe)

163.    Plaintiff incorporates by reference paragraph 1 through 162 as if fully set forth herein.

164.    By and through their conduct, as described herein in this Complaint, and acting under color of state law, City Attorney Middlecamp and Sgt. McCabe are liable to Plaintiff under 42 U.S.C. § 1983 for the violations of Plaintiff's constitutional rights under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution by withholding exculpatory evidence within their possession, custody and/or control in the matter State of Minnesota v. Fredin. Sgt. McCabe and City Attorney Middlecamp's unlawful actions were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

165.    As a direct and proximate result of City Attorney Middlecamp and Sgt. McCabe's unlawful actions, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.

## COUNT XIV
## ABUSE OF PROCESS
(City Attorney Middlecamp, Defendant Schaefer, and Defendant Miller, Sgt. David McCabe)

166.    Plaintiff incorporates by reference paragraph 1 through 165 as if fully set forth herein.

167.    City Attorney Middlecamp, Defendant Miller, Defendant Schaefer and Sgt. McCabe used legal criminal process by instigating the criminal action State of Minnesota v. Fredin described herein in this Complaint as the complaining witness and/or investigator.

168.     City Attorney Middlecamp, Defendant Miller, Defendant Schaefer and Sgt. McCabe instigated the criminal action in *State of Minnesota v. Fredin* for multiple collateral purposes as described herein in this Complaint.

169.     City Attorney Middlecamp, Defendant Miller, Defendant Schaefer and Sgt. McCabe made multiple knowingly false statements of fact in the criminal action *State of Minnesota v. Fredin* in an effort to instigate criminal legal proceedings against Plaintiff in State of *Minnesota v. Fredin* as described herein in this Complaint.

170.     As a direct and proximate result of City Attorney Middlecamp, Defendant Miller, Defendant Schaefer and Sgt. McCabe's unlawful actions, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.

### COUNT XV
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(City Attorney Middlecamp, Defendant Schaefer, and Defendant Miller)

171.     Plaintiff incorporates by reference paragraph 1 through 170 as if fully set forth herein.

172.     City Attorney Middlecamp, Defendant Miller, and Defendant Schaefer has engaged, instigated, and directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard for causing, emotional distress to Plaintiff, namely the instigation of baseless criminal charges against Plaintiff in the matter State of Minnesota v. Fredin. In furtherance of this conduct, City Attorney Middlecamp, Defendant Miller, and Defendant Schaefer made materially false statements and used City Attorney Middlecamp's influence as an Assistant City Attorney to cause Plaintiff to be falsely arrested and to suffer the imposition of an unlawful bail. Upon information and belief, during Plaintiff's detention, City

Attorney Middlecamp, Defendant Miller, and Defendant Schaefer engaged in a course of

conduct and used City Attorney Middlecamp's influence as an Assistant Minneapolis City

Attorney to prolong Plaintiff's detention and to make Plaintiff's unlawful detention inhumane,

cruel and outrageous as described in this Complaint.

173.     As a proximate result of their actions, Plaintiff has suffered and continues to

suffer severe and extreme emotional distress, entitling him to actual and punitive

## COUNT XVI
## FRAUD
### (City Attorney Middlecamp, Defendant Schaefer, and Defendant Miller)

174.     Plaintiff incorporates by reference paragraph 1 through 173 as if fully set forth

herein.

175.     As described herein in this Complaint, Plaintiff was unlawfully arrested, charged

and detained in the matter State of Minnesota v. Fredin.  Plaintiff's unlawful arrest, criminal

charge and detainment was a direct and proximate result of knowingly false statements made

by Defendant Miller, City Attorney Middlecamp, and Defendant Schaefer to investigators, the

Saint Paul Police Department and Saint Paul City Attorney's Office and in sworn statements

provided to the Ramsey County District Court. In making these knowingly false statements that

were relied upon by investigator, the Saint Paul City Attorney's Office and the Ramsey County

Criminal Court, Defendant Miller, City Attorney Middlecamp, and Defendant Schaefer

committed fraud. As a proximate result of their actions,

176.   · Plaintiff has suffered and continues to suffer severe and extreme emotional

distress, entitling him to actual and punitive damages in an amount to be determined at trial.

## COUNT XVII

## **CONSPIRACY**
### (City Attorney Middlecamp, Defendant Schaefer, and Defendant Miller)

177.    Plaintiff incorporates by references paragraph 1-176 of this Complaint as though fully set forth herein.

178.    Defendant Miller, City Attorney Middlecamp, and Defendant Schaefer instigated multiple bogus contempt hearings and collateral legal process throughout the *Miller v. Fredin, Schaefer v. Fredin, and Middlecamp v. Fredin* tenure to harm Plaintiff Fredin and to harass constituting an ongoing conspiracy, express or implied, that was conceived no later than April 24th, 2016.

179.    Based on court records, Defendant Miller, City Attorney Middlecamp, and Defendant Schaefer began her fraud on the Court during this period, and particularly during a mid/late December 2017 period.  At all times Defendant Schaefer and Defendant Miller acted in concert in carrying out the fraud, false arrest, defamation, malicious prosecution, as described in preceding paragraphs.  Defendant Miller, City Attorney Middlecamp, and Defendant Schaefer have, to varying degrees, participated in planning and carrying out the objectives of the conspiracy, but both are nevertheless liable for the concerted action of their fellow co-conspirator.

180.    The objective of the conspiracy was to commit false arrest/imprison Plaintiff. The secondarily objective of the conspiracy was to harass and stalk the Plaintiff.

181.    In furtherance of this conspiracy, Defendant Miller, City Attorney Middlecamp, and Defendant Schaefer undertook actions constituting civil conspiracy to commit the common law torts of false arrest/imprisonment by unlawfully confining Plaintiff as described in the preceding paragraphs.

182.    As a proximate result of this conspiracy, Plaintiff suffered the physical and
emotional harm set forth herein.

### ATTORNEY FEES AND COSTS

Plaintiff demands reasonable attorney fees, costs, and fees pursuant to 28 U. S. C. §1927.

### JURY TRIAL DEMANDED

Plaintiff demands a jury on all issues which may be properly tried by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Fredin prays that the Court:

   a.  Enter judgment in favor of Plaintiff against Defendants;

   b.  Enter judgement awarding Plaintiff prospective declaratory relief declaring the
       Defendants conduct towards Plaintiff inconsistent with Due Process;

   c.  Enter judgement awarding Plaintiff prospective declaratory relief declaring Referee
       Clysdale's October 2nd, 2017 final Prior Restraint Order in *Middlecamp v. Fredin*
       against Plaintiff inconsistent with the First Amendment and Due Process.

   d.  Enter judgement awarding Plaintiff prospective injunctive relief declaring Referee
       Clysdale's October 2nd, 2017 final Prior Restraint Order in *Middlecamp v. Fredin*
       against Plaintiff inconsistent with the First Amendment and Due Process.

   e.  Enter judgement awarding Plaintiff prospective declaratory relief declaring Sgt.
       McCabe's April 28th, 2017 Raid against Plaintiff inconsistent with the First, Fourth
       and Fourteenth Amendment and Due Process.

   f.  Enter judgement awarding Plaintiff compensatory damages on all counts herein
       seeking money damages to compensate Plaintiff for Defendants activities complained

of herein and for any injury complain of herein, inclusive of interest and costs, in an amount to be determined at trial;

g.  Enter judgement awarding punitive, exemplary, enhanced, and/or treble damages as allowed by applicable state and federal law in an amount to be determined at trial;

h.  Enter judgment awarding Plaintiff compensatory damages on all counts herein to compensate Plaintiff for Defendants activity complained of herein and for any injury complained of herein, inclusive of interest and costs, in an amount to be determined at trial;

i.  Enter judgment awarding punitive, exemplary, enhanced and/or treble damages as allowed by applicable state and federal law in an amount to be determined at trial;

j.  Enter judgment awarding Plaintiff injunctive relief requiring Defendant Middlecamp to remove her defamatory statements concerning Plaintiff Fredin from her Twitter account @CardsAgstHrsmt;

k.  Enter judgement recommending sanctions against Defendant Middlecamp and the disbarment from the practice of law in the State of Minnesota and elsewhere;

l.  Enter judgment awarding Plaintiff Fredin his fees and costs reasonably incurred in this action as allowed by applicable state and federal law; and

m.  Order such other relief that the Court deems just and appropriate.

Dated: February 22nd, 2018
Hudson, WI

/s/ Brock Fredin

_____

Brock Fredin
1905 Iris Bay

Hudson, WI 54016
(612) 424-5512 (tel.)
brockf12@gmail.com
*Plaintiff, Pro Se*