## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Brock Fredin,

               Plaintiff,

v.

Elizabeth A. Clysdale, David E.
McCabe, Grace Elizabeth Miller,
Catherine Marie Schaefer, and Lindsey
Middlecamp,

               Defendants.

Civil No. 18-cv-0510 (SRN/HB)

**REPORT AND
RECOMMENDATION**

HILDY BOWBEER, United States Magistrate Judge

       This matter is before the Court on Defendant Referee Elizabeth Clysdale's Motion to Dismiss [Doc. No. 38]; Defendants Grace Elizabeth Miller, Catherine Marie Schaefer, and Lindsey Middlecamp's Motion to Dismiss [Doc. No. 44]; Defendant Sergeant David E. McCabe's Motion to Dismiss [Doc. No. 49]; and Plaintiff Brock Fredin's Motion for Leave to File a Second Amended Complaint [Doc. No. 80]. The motions to dismiss were referred to the undersigned for the issuance of a report and recommendation ("R&R"). The Court will also address the motion for leave to file a second amended complaint in this R&R, rather than a separate order, in the interests of practicality, expediency, and judicial economy.

       In light of the specific facts and circumstances of this case, the most sensible route is to address Fredin's motion for leave to file a second amended complaint before

1

addressing Defendants' motions to dismiss.[1]

## I.     Fredin's Motion for Leave to File Second Amended Complaint

### A.     Background

Fredin filed his initial complaint in this matter on February 22, 2018.  [Doc. No.

1.]  On February 27, 2018, Fredin filed a Motion for Leave to File Amended Complaint

for Permanent Injunction and Other Equitable Relief [Doc. No. 4], and he filed an

Amended Complaint on March 2, 2018 [Doc. No. 8].  The Court granted Fredin's motion

to amend pursuant to Federal Rule of Civil Procedure 15(a)(1), which permits a party to

amend a pleading once as a matter of course.  (Order at 2-3, Apr. 10, 2018 [Doc. No.

33].)  Accordingly, the Court deemed the Amended Complaint filed at Doc. No. 8 as the

operative pleading.  (*Id.*)

On March 28, 2018, Fredin filed a second motion to amend his complaint.  [Doc.

No. 14.]  On April 10, 2018, the Court denied that motion pursuant to Rule 15(a)(2), for

the following reasons: (1) Fredin did not meet and confer with the opposing party in a

good-faith effort to resolve the issues raised by the motion, as required by D. Minn. LR

7.1(a); (2) Fredin did not contact this Court's courtroom deputy to schedule a hearing on

---

[1] A court has discretion in this regard.  *Compare Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 956 (8th Cir. 2002) (indicating that a court should generally resolve a motion to amend before a motion to dismiss) *and Garrison v. Minn. Dep't of Revenue*, No. 16-cv-2866 (WMW/HB), 2017 WL 3382778, at *5 (D. Minn. Aug. 7, 2017) (first granting motion to amend and then construing motion to dismiss to apply to the newly operative pleading) *with Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 227 (8th Cir. 2018) (clarifying that *Pure Country* was not "settled law" requiring a court to address a motion to amend before a motion to dismiss) *and Meyer v. Haeg*, No. 15-cv-2564 (SRN/HB), 2016 WL 8671831, at *2 (D. Minn. Dec. 9, 2016) (noting that an R&R on motions to dismiss was issued before an order on motion to amend).

the motion, as required by D. Minn. LR 7.1(b); (3) Fredin did not provide "a version of the proposed amended pleading that shows — through redlining, underlining, strikeouts, or other similarly effective typographic methods — how the proposed amended pleading differs from the operative pleading," as required by D. Minn. LR 15.1(b); and (4) the proposed pleading violated Federal Rule of Civil Procedure 8(a)(2), which requires a complaint to set forth "a short and plain statement of the claim[s]" entitling Fredin to relief.  (Order at 3, Apr. 10, 2018 [Doc. No. 33].)

Fredin filed a third motion to amend on May 16, 2018.  [Doc. No. 67.]  The Court denied that motion without prejudice because Fredin failed to remedy any of the deficiencies underlying the denial of his earlier motion to amend.  (Order at 2, May 17, 2018 [Doc. No. 70].)  Significantly, Fredin also did not file a copy of the proposed amended complaint, without redlining, as required by D. Minn. LR 15.1(b).

Fredin filed the motion to amend presently before the Court on June 15, 2018.  He seeks to amend the complaint to add new "significant factual developments" that have occurred since he filed the first complaint in this matter, particularly with respect to three contempt hearings initiated by Miller and Schaefer in state court.  (Pl.'s Mot. Leave File Second Am. Compl. ("SAC") at 2 [Doc. No. 80].)  The proposed SAC, at fifty-three pages long and asserting eight claims for relief, is also significantly more concise than the Amended Complaint, which is 100 pages long, plus 59 pages of exhibits, and asserting 17 claims for relief.

Despite the Court's prior admonitions, Fredin did not file a proper redlined version of the proposed SAC with his motion to amend.  He submitted a redlined version of *a*

complaint, but that filing differed materially from the proposed SAC he submitted.

(*Compare* Proposed SAC [Doc. No. 80-1] *with* Redlined Proposed SAC [Doc. No. 80-2].)  At some point Fredin recognized his error, and he filed a corrected redlined version on June 29, 2018 [Doc. No. 84].  That was too late, however, to allow Defendants to meaningfully review the redlined version before their opposition memoranda were due.

Miller, Schaefer, Middlecamp, and Referee Clysdale oppose the motion to amend on the ground of futility and because Fredin failed to comply with D. Minn. LR 15.1's requirement to provide a redlined version of the proposed SAC.  Sergeant McCabe opposes the motion on the basis of futility and because Fredin failed to meet and confer before filing the motion, as required by D. Minn. LR 7.1(a).

### B.     Discussion

Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, "a party may amend its pleading only with the opposing party's written consent or the court's leave," and "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "[T]here is no absolute right to amend," however, and a court may deny leave to amend "based upon a finding of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies in previous amendments, undue prejudice to the non-moving party, or futility."  *Baptist Health v. Smith*, 477 F.3d 540, 544 (8th Cir. 2007) (citation omitted).

To the extent Defendants argue the amendments are futile, the Court will defer that analysis and address those arguments below in the context of the motions to dismiss. With respect to Defendants' argument that Fredin failed to meet and confer with Sergeant McCabe and did not timely submit a redlined version of the proposed SAC, the Court

will forgive these deficiencies on this one occasion. Fredin at least attempted to confer with Sergeant McCabe's counsel the day before he filed the motion, though Sergeant McCabe's attorney was, understandably, not able to engage in a meaningful meet-and-confer on such short notice. (Hanson Second Aff. Ex. A [Doc. No. 86-1].) As to the incorrect redlined proposed SAC, Fredin filed a corrected version when he became aware of the error, and it appears from Defendants' filings that they were able to identify the substantive amendments on their own and, although inconvenienced, were not harmed by the error. Consequently, the Court recommends that Fredin be granted leave to amend and, in the interest of expediency and for Fredin's convenience,[2] further recommends that the Clerk's Office be directed to file and docket the proposed SAC currently located in the record at Doc. No. 80-1 as the "Second Amended Complaint."

## II.    Defendants' Motions to Dismiss

The Court will consider Defendants' motions to dismiss as applied to the SAC. *See Cedar Rapids Lodge & Suites, LLC v. Seibert*, No. 14-cvV-04839 (SRN/KMM), 2018 WL 747408, at \*7 (D. Minn. Feb. 7, 2018) (applying motions to dismiss to second amended complaint after granting leave to amend).

### A.    Allegations in the Second Amended Complaint

Fredin contends generally that Defendants Miller, Schaefer, Middlecamp, and Referee Clysdale engaged in an unlawful conspiracy and committed numerous tortious

---

[2] Fredin was incarcerated recently at the Ramsey County Correctional Facility and states that he has limited access to his case-related materials. (*See* Fredin Letter, Oct. 31, 2018 [Doc. No. 102]; Order at 1, Nov. 2, 2018 [Doc. No. 103].)

acts against him in a social media smear campaign.  (SAC ¶ 1.)  He asserts that Sergeant McCabe committed unconstitutional and other unlawful actions in executing a search warrant at his home.  (SAC ¶ 2.)

### 1.    The Parties

Referee Clysdale is a Ramsey County District Court referee who presided over three civil harassment restraining order ("HRO") proceedings against Fredin: *Miller v. Fredin*, Case No. 62-HR-cv-16-46; *Schaefer v. Fredin*, Case No. 62-HR-cv-16-411; and *Middlecamp v. Fredin*, Case No. 62-HR-cv-17-233.  (SAC ¶¶ 8-11.)  Fredin sues Referee Clysdale only in her individual capacity.  (SAC ¶ 8.)

Middlecamp was formerly employed as an assistant city attorney for Minneapolis. (SAC ¶ 9.)  She is currently a Special Assistant United States Attorney with the United States Attorney's Office in the District of Minnesota.  (SAC ¶ 9.)  Middlecamp obtained an HRO against Fredin in the *Middlecamp* HRO state court proceeding.  Fredin alleges that Middlecamp has a Twitter account @CardsAgstHrsmt that she used to defame and disparage him.  (SAC ¶ 9.)  Fredin sues Middlecamp in her official and individual capacities.  (SAC ¶ 9.)

Miller previously dated Fredin.  (SAC ¶ 1.)  Miller obtained an HRO against Fredin in the *Miller* HRO state court proceeding.  She is being sued in her individual capacity.  (SAC ¶ 10.)

Schaefer is currently a Ph.D. student at Penn State.  (SAC ¶ 16.)  She obtained an HRO against Fredin in the *Schaefer* HRO state court proceeding.  She is also sued in her individual capacity.  (SAC ¶ 11.)

Sergeant McCabe is a detective with the Saint Paul Police Department. (SAC ¶ 12.) He obtained and executed a search warrant at Fredin's residence, which Fredin contends was manufactured and falsified to gather evidence on Middlecamp's behalf in her state court case against Fredin. (SAC ¶ 12.) Fredin sues Sergeant McCabe in his individual and official capacities. (SAC ¶ 12.)

### 2. The Alleged Conspiracy Between Referee Clysdale, Miller, Schaefer, and Middlecamp

Fredin alleges that Referee Clysdale has a personal relationship with Miller, Schaefer, and Middlecamp, and wrongly issued HROs against him in the three state court proceedings. (SAC ¶ 13.) Fredin alleges that these four Defendants conspired to obtain information for the purpose of publicly disparaging and defaming him on Twitter and other social media, forcing him to expend large amounts of money to defend himself, and generating a basis for criminal charges. (SAC ¶ 14.) The alleged object of the conspiracy was to interfere with the judicial process. (SAC ¶ 98.)

Fredin and Miller began dating in July 2015. (SAC ¶ 20.) After they broke up January 2016, Fredin was "heartbroken" and sent several communications to Miller attempting to resume their relationship. (SAC ¶ 15.) Schaefer, a friend of Miller's, allegedly urged Miller to pursue an HRO against Fredin, and Miller did so in January 2016. (SAC ¶¶ 15, 16, 22.) In applying for the HRO, Miller explained that she "tried to break off her relationship with [Fredin]. I told him we could date casually, but he began to tell me I couldn't see other men, and on one of our dates he was rude and asked me vulgar questions." (SAC ¶ 22.) Referee Clysdale issued the HRO. (SAC ¶ 22.) Fredin

7

alleges that Middlecamp used her friendship with Referee Clysdale to facilitate the issuance of the HRO.  (SAC ¶ 84.)

Fredin and Schaefer had actually met online two years earlier, in March 2014, through a dating website.  (SAC ¶¶ 16, 18.)  Fredin and Schaefer had scheduled a blind date, but "Plaintiff stood Shaefer up" without notice.  (SAC ¶ 16.)  As a result, Fredin alleges, Schaefer filed false police reports claiming Fredin harassed her via phone calls and text messages; a police investigation later revealed those phone calls and text messages were from telemarketers and from Schaefer's own phone.  (SAC ¶¶ 16, 93.)  Fredin alleges that Schaefer has contacted numerous women connected to him "in an effort to destroy his personal and professional reputation with lies."  (SAC ¶ 16.)  Schaefer also allegedly "created two revenge pornography catfish dating profiles" in other women's names to entice Fredin.  (SAC ¶ 16.)

Fredin alleges that Middlecamp is a close friend of Miller and Schaefer.  (SAC ¶ 17.)  She allegedly uses an "anonymous @CardsAgstHrsmt Twitter account to shame, ridicule, and terrorize men," including Fredin.  (SAC ¶ 17.)  Between 2014 and 2016, Middlecamp and Schaefer allegedly "attempted to anonymously catfish Plaintiff with fake dating profiles on OkCupid and other dating websites."  (SAC ¶ 19.)

On February 2016, Miller filed a police report asserting that Fredin had violated the HRO because his Match.com dating profile sent her a push notification after she viewed it.  (SAC ¶ 23.)  Miller was granted a two-year HRO in March 2016, and Fredin appealed.  (SAC ¶¶ 25, 27.)  In May 2016, Miller threatened Fredin with contempt proceedings over some Facebook posts.  (SAC ¶ 28.)  Fredin alleges that Miller

8

repeatedly contacted him to incite him to violate the HRO.  (SAC ¶ 85.)  In September

2016, Miller asked for a contempt hearing based on the Facebook posts, and Referee

Clysdale granted the request.  (SAC ¶ 33.)

In May and June 2016, Fredin alleges, Schaefer created false dating profiles and

advertisements for sex on adult websites in Fredin's name and using Fredin's private

email address, which caused Fredin to receive hundreds of unwanted emails.  (SAC

¶¶ 29, 87, 103.C.)  Fredin sent a message to Schaefer via Facebook[3] asking her to remove

the advertisements.  (SAC ¶ 30.)  Schaefer then filed for an HRO, claiming she had

received unwanted phone calls and messages.  (SAC ¶ 31.)  Fredin alleges that was a

misrepresentation.  (SAC ¶ 31.)  Fredin later received several anonymous text messages

from someone he believes was associated with Schaefer, threatening "we are watching

you."  (SAC ¶¶ 32, 36.)  Schaefer obtained a "bogus HRO" against Fredin in July 2016

and threatened to "take down" Fredin.  (SAC ¶ 89.)  On November 17, 2016, Referee

Clysdale granted Schaefer a final two-year HRO.  (SAC ¶ 34.)  That same day, Fredin

filed a police report describing the sexual advertisements allegedly placed by Schaefer for

the purpose of soliciting Fredin and obtaining a fraudulent HRO.  (SAC ¶ 35.)

In January 2017, Middlecamp tweeted a comment about a forthcoming opinion by

the Minnesota Court of Appeals in *Miller v. Fredin*, No. A16-0613, 2017 WL 280974, at

*1 (Minn. Ct. App. Jan. 23, 2017), specifically, that the opinion "destroyed" Fredin.

(SAC ¶ 37.)  The opinion had not yet been released to the public.  (SAC ¶ 37.)  The tweet

---

[3] Fredin also refers to this communication as an email.  (SAC ¶ 87.)

also included photographs of Fredin and was "liked" by hundreds of people.  (SAC ¶ 37.)

The tweet was later deleted.  (SAC ¶ 109.A.)  The day after the opinion was filed,

Middlecamp tweeted: "Women of MN: this is Brock Fredin, aka Dan/Will.  He has at

least two restraining orders against him.  Please RT to help keep women safe."  (SAC

¶¶ 39, 126.)  Middlecamp also allegedly shared Fredin's work location and photographs

from Fredin's dating profiles.  (SAC ¶ 40.)  Fredin received many threats via Facebook

and Twitter.  (SAC ¶ 40.)

Between the end of January and April 2017, Middlecamp allegedly attacked

Fredin on Twitter more than fifty times.  (SAC ¶ 41.)  Sergeant McCabe reopened an

investigation in the *Miller v. Fredin* case as a result.  (SAC ¶ 43.)  In February 2017, an

article about Fredin was published in *City Pages*, in which, Fredin alleges, Schaefer

admitted she had colluded with Miller in obtaining HROs against Fredin, and Miller and

Schaefer admitted that Miller had coached Schaefer in obtaining her HRO.  (SAC ¶¶ 45,

124.)

Schaefer requested a contempt hearing in April 2017 after learning of a Facebook

post and police report by Fredin concerning sexual advertisements.  (SAC ¶ 44.)  About

the same time, Middlecamp requested an HRO on the basis that she felt threatened by a

Facebook post by Fredin.  (SAC ¶ 46.)  Fredin denies ever meeting, speaking to, or

interacting with Middlecamp.  (SAC ¶ 46.)

On April 28, 2017, Sergeant McCabe executed a search warrant at Fredin's home.

(SAC ¶ 48.)  Sergeant McCabe also served Fredin with Middlecamp's HRO request and

Schaefer's motion for contempt at that time.  (SAC ¶ 49.)  During the execution of the

warrant, Sergeant McCabe and other officers seized Fredin's computers, phones, and storage devices.  (SAC ¶ 50.)  Fredin asserts the evidence was seized for use in the two civil HRO proceedings.  (SAC ¶ 50.)  On May 2, 2017, Fredin was charged with criminal gross misdemeanor stalking and an HRO violation in the *Miller v. Fredin* case.  (SAC ¶ 51.)

On May 31, 2017, Fredin discovered a false dating profile on a "seedy adult website," allegedly created by Schaefer, that contained Fredin's name, email address, photographs, and other private information.  (SAC ¶ 103.D.)  Fredin discovered a similar profile on another website the following day.  (SAC ¶ 103.E.)

On September 21, 2017, Referee Clysdale presided over a hearing in the *Middlecamp* HRO proceeding.  (SAC ¶ 57.)  Referee Clysdale issued an order on October 2, 2017, precluding Fredin from making any statement about Middlecamp.  (SAC ¶ 59.)

Meanwhile, on August 7, 2018, Sergeant McCabe returned the items he had seized from Fredin's residence.  (SAC ¶ 56.)  Fredin alleges that many devices had data or user accounts deleted.  (SAC ¶ 56.)

In December 2017, Schaefer and Middlecamp filed for contempt hearings in their respective cases, and Referee Clysdale issued orders to show cause.  (SAC ¶¶ 61, 62.)  Referee Clysdale held a contempt hearing in *Middlecamp* on January 4, 2018.  (SAC ¶ 65.)  During the hearing, Middlecamp pressed Fredin for his address, and Fredin accused her of asking for his address for the purpose of raiding his house again.  (SAC ¶ 65.)  After the hearing concluded, Referee Clysdale directed her bailiff to arrest Fredin based on Middlecamp's statement that she had overheard Fredin make threats against her

11

during a conversation he had with his family after the hearing.  (SAC ¶¶ 58, 66, 166.)

In late January 2018, Fredin was charged for violating the HRO in *Middlecamp*. (SAC ¶ 68.)  Fredin believes the charge was brought to conceal Referee Clysdale's conflict of interest.  (SAC ¶ 68.)

Contempt hearings were held in the *Middlecamp* and *Schaefer* cases in February 16, 2018.  (SAC ¶¶ 69, 70.)  Additional contempt hearings were held in the *Schaefer* case in May and June 2018.  (SAC ¶¶ 74-75.)  Miller petitioned for a second HRO in March 2018.  (SAC ¶ 71.)

In April 2018, Fredin obtained "hundreds of false police reports filed by" Schaefer.  (SAC ¶ 72.)  One report referred to a text message from Schaefer to Fredin that read: "Listen Brock, I have a hilarious secret for you.  Lindsey [Middlecamp] and Clydesdale [sic] have a mutual bestie and have been hanging out for years.  You are going down way further than you imagined.  You messed with the wrong women."  (SAC ¶¶ 72, 119.)

### 3.    Alleged Abuse of Process by Sergeant McCabe

Fredin alleges that Sergeant McCabe engaged in an abuse of process by seeking and executing a "no-knock" search warrant at Fredin's residence on April 28, 2017. (SAC ¶ 130.)  The warrant was obtained ostensibly to seize evidence pertaining to a criminal investigation into Miller's allegations that Fredin had violated the HRO against him.  (SAC ¶ 130.)  Fredin alleges there was another, undisclosed reason: that the April 28, 2017, search warrant was used "for the unlawful collateral purpose of attempting to procure evidence on behalf of Defendant Middlecamp in her civil HRO proceeding

against Plaintiff." (SAC ¶ 133.) Fredin identifies a statement by Sergeant McCabe in a police report that the search warrant was obtained "at the direction of the SPCA to obtain/preserve evidence of this case, and other pending cases." (SAC ¶ 131.) Fredin alleges there were no other pending criminal cases in April 2017, and he believes Sergeant McCabe was referring to the *Middlecamp* HRO civil proceeding. (SAC ¶ 132.)

Fredin also alleges the search warrant violated *Franks v. Delaware*, 438 U.S. 154 (1978), because it contained deliberate or reckless falsehoods or omissions. (SAC ¶ 135.)

### 4.    Causes of Action

Based on the above factual allegations, Fredin brings the following claims:

- Count 1: retaliation in violation of the First Amendment against Sergeant McCabe and Middlecamp;

- Count 2: violation of the Fourth and Fourteenth Amendments, based on unlawful search and seizure, against Sergeant McCabe and Middlecamp;

- Count 3: abuse of process against Middlecamp, Schaefer, Miller, and Sergeant McCabe;

- Count 4: fraud and negligent misrepresentation against Middlecamp, Schaefer, and Miller;

- Count 5: defamation against Middlecamp and Schaefer;

- Count 6: violation of the Fourth and Fourteenth Amendments, based on excessive force, against Middlecamp and Sergeant McCabe;

- Count 7: violation of Fourth and Fourteenth Amendments, based on false arrest/imprisonment, against Middlecamp, Schaefer, Miller, and Sergeant McCabe; and

- Count 8: conspiracy against Middlecamp, Schaefer, Miller, Sergeant McCabe, and Referee Clysdale.

### B.    Legal Standards

All Defendants move to dismiss the claims against them pursuant to Federal Rule

of Civil Procedure 12(b)(6).  On a Rule 12(b)(6) motion to dismiss, the Court "must take the well-pleaded allegations of the complaint as true, and construe the complaint, and all reasonable inferences arising therefrom, most favorably to the pleader." *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A court has the duty to construe liberally a pro se party's pleadings.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Generally, on a Rule 12(b)(6) motion, a court may not consider matters outside the pleadings in assessing the sufficiency of a complaint.  *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (citations omitted).  A court may make exceptions to this rule for matters of public record, materials "necessarily embraced by" the complaint, and exhibits submitted with the complaint.  *Id.* (citations omitted).

### C.    Discussion

#### 1.    Retaliation Claim

Count 1 of the SAC asserts a 42 U.S.C. § 1983 claim against Sergeant McCabe and Middlecamp for retaliation based on Fredin's exercise of his First Amendment rights to petition the courts for redress and to criticize a public official.  (SAC ¶ 137.)  Sergeant McCabe argues that Fredin has failed to state a viable First Amendment claim for retaliation.

14

"To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004).

Sergeant McCabe acknowledges that petitioning a court for redress and criticizing a public official are protected activities under the First Amendment. (McCabe Mem. Supp. Mot. Dismiss at 27 [Doc. No. 51].) He argues, however, that Fredin has not alleged facts sufficient to create a plausible inference of an adverse action that would chill an ordinary person from continuing the activity. The adverse actions identified by Fredin are fabricated police reports, frivolous charges, and the procurement and execution of the search warrant at his residence. (*See* Pl.'s Mem. Opp'n Miller Mot. Dismiss at 19 [Doc. No. 74].) But Fredin does not allege that either Sergeant McCabe or Middlecamp filed a false police report. Rather, he alleges that Schaefer and Miller fabricated police reports. Nor did Sergeant McCabe or Middlecamp charge Fredin with any crime. Criminal charges were brought by the St. Paul City Attorney's Office. (SAC ¶¶ 51, 128.) Indeed, Fredin was convicted of stalking on October 17, 2018. *See* Register of Actions, *State v. Fredin*, Case No. 62-cr-17-3156 (Ramsey Cty. Dist. Ct.) Thus, it would not be reasonable to infer that the charge was frivolous.

As to the search warrant, the Court recommends converting this part of Sergeant McCabe's motion to dismiss to a motion for summary judgment so that it may review the search warrant. "A court may . . . convert only part of a 12(b)(6) motion into a Rule 56

motion." *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 357 (S.D.N.Y. 2016).

Sergeant McCabe's motion sought dismissal or summary judgment in the alternative, and

he submitted materials outside the pleadings, including the search warrant, in support of

his motion.  The Court advised the parties in an order dated April 26, 2018, that the Court

was considering conversion pursuant to Federal Rule of Civil Procedure 12(d), and

instructed Fredin to submit all evidence that would be pertinent to a summary judgment

motion with his responsive memorandum.  (Order at 2, Apr. 26, 2018 [Doc. No. 61].) [4]

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  The Court views the evidence and the inferences that may be

reasonably drawn from the evidence in the light most favorable to the nonmoving party.

*Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The party

opposing a properly supported motion for summary judgment may not rest on mere

allegations or denials, but must set forth specific facts in the record showing there is a

genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

The Court concludes that Fredin's search-warrant based retaliation claim against

Sergeant McCabe fails as a matter of law because the search warrant was supported by

probable cause.  The Court finds instructive *Hartman v. Moore*, 547 U.S. 250 (2006), and

*Galarnyk v. Fraser*, 687 F.3d 1070 (8th Cir. 2012).  In *Hartman*, the Supreme Court held

---

[4] Even if the Court did not convert this part of the motion, the SAC itself sets forth the relevant content of the affidavit.  (SAC ¶ 135.)

that a plaintiff asserting a First Amendment claim based on retaliatory prosecution must allege and prove there was no probable cause for the underlying charge.  547 U.S. at 252. In *Galarnyk*, the Eighth Circuit held that the existence of probable cause for an arrest was fatal to the plaintiff's First Amendment retaliatory arrest claim.  687 F.3d at 1076.  By analogy, if probable cause exists for the search warrant here, Fredin's First Amendment claim for retaliation based on Sergeant McCabe's procurement and execution of the search warrant fails.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.  To that end, every search warrant must be supported by probable cause, supported by a sworn affidavit, and describe with particularity the place to be searched and the items or persons to be seized.  *Id.*  The task of a judge presented with a search warrant is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  As the very term implies, probable cause "deal[s] with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

The search warrant executed at Fredin's residence sought evidence related to stalking or harassment.  (McCabe Ex. N [Doc. No. 59].)  The affidavit in support of the search warrant application was sworn to by Hudson Police Detective Traci Hall, who

averred that she was contacted by Sergeant McCabe for assistance in drafting and executing the search warrant. (*Id.*) Hall's affidavit relayed that Fredin had been stalking and harassing Miller since early 2016, specifically by posting messages about her on social media and dating websites, in violation of an HRO. (*Id.*) Fredin refused to remove the posts when asked. (*Id.*) Law enforcement verified that Fredin's email address had been used to make the posts, and the most recent post occurred on April 5, 2017. (*Id.*) The warrant application requested authority to seize items capable of creating, storing, and disseminating harassing material online and through social media. (*Id.*)

The Court finds that the information set forth in Hall's affidavit provided probable cause to believe that contraband or evidence of stalking or harassment would be found in Fredin's residence. Consequently, Sergeant McCabe is entitled to summary judgment on Fredin's First Amendment retaliation claim based on the procurement and execution of the search warrant.

To the extent Fredin claims that Middlecamp played a part in the procurement and execution of the search warrant, his retaliation claim against her fails to state a claim. The most Middlecamp is alleged to have done was to have a conversation with Sergeant McCabe about her own HRO petition before he obtained the search warrant. (SAC ¶ 132.) This is not the type of adverse action that would chill an ordinary person from engaging in protected activity.

Accordingly, the Court recommends that summary judgment be granted in favor of Sergeant McCabe on Fredin's search warrant-based retaliation claim and that the other aspects of Fredin's retaliation claim against Sergeant McCabe and Middlecamp be

dismissed with prejudice for failure to state a claim.

### 2.    Fourth and Fourteenth Amendments–Unlawful Search and Seizure Claim

Count 2 of the SAC asserts a claim against Sergeant McCabe, pursuant to § 1983, and against Middlecamp directly for violating Fredin's Fourth and Fourteenth Amendment rights by committing an unlawful search and seizure.  (SAC ¶ 140.)  Fredin contends there was no probable cause for the warrant executed at his home on April 28, 2017, and that Sergeant McCabe omitted key information from his affidavit, including that the search would be performed in aid of "other pending cases."  (SAC ¶¶ 140-41, 143.)  Fredin alleges that Middlecamp is liable because she had "substantive conversations" with Sergeant McCabe before the search.  (SAC ¶ 143.)

The Court has already determined that the search warrant was supported by probable cause, and incorporates that discussion here.  Whether the *execution* of a search warrant was reasonable is an objective question that ignores the subjective intent of the officers.  *Lykken v. Brady*, 622 F.3d 925, 930 (8th Cir. 2010).  The Court finds that even if Sergeant McCabe had an ulterior purpose, his subjective motives did not affect the reasonableness of the execution of the search and seizure.  Fredin identifies no unreasonable actions undertaken during the search itself, and only items authorized by the warrant were seized.

As to the alleged omissions and misstatements made by Sergeant McCabe, as conveyed to Detective Hall, Sergeant McCabe claims qualified immunity.  The Court will also recommend converting this portion of the motion to dismiss to a motion for

summary judgment so that it can consider materials outside the pleadings.

"Qualified immunity shields a public official from suit for civil damages when his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bernini v. City of St. Paul*, 665 F.3d 997, 1002 (8th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Determining whether an official is entitled to qualified immunity requires a court to answer two questions: "(1) whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Peterson v. Kopp*, 754 F.3d 594, 598 (8th Cir. 2014) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)) (internal quotation marks omitted). A government official is entitled to qualified immunity unless "both of these questions are answered affirmatively." *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (quotation omitted). The Court has discretion which prong "should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. Thus, when a court concludes that a constitutional right was not violated, it need not address whether the right was clearly established at the time of the alleged violation. *Fields v. Abbott*, 652 F.3d 886, 894 (8th Cir. 2011).

The constitutional right at issue is grounded in the Fourth Amendment. A search warrant based on an affidavit that contains a deliberate falsehood or reckless disregard for the truth violates the Fourth Amendment. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). A challenge to the affidavit "may not be conclusory, and must be accompanied by adequate evidentiary support." *Hunter v. Namanny*, 219 F.3d 825, 830 (8th Cir. 2000)

(citing *Franks*, 438 U.S. at 170-71).

Fredin identifies several alleged falsehoods in the search warrant affidavit.[5]  He first challenges a statement in paragraph 6: "On 02/09/2016, Fredin began posting messages on the public portion of his Match.com account page."  (McCabe Ex. N.) Fredin asserts this statement is false because he made an "innocent Match.com profile edit . . . nearly two years before" the warrant was executed.  (SAC ¶ 135.)  Fredin provides no evidentiary support in support of his assertion, but cites to a paragraph in his First Amended Complaint.  This is not sufficient to establish a deliberate falsehood or reckless disregard for the truth.  In addition, Fredin did not include the full statement in the SAC, thereby misrepresenting its content.  Specifically, he omitted the "02/09/2016" date from the allegation in the SAC, thereby suggesting that the affiant misrepresented the length of time between the Match.com activity and the application for the warrant. But the affidavit included the February 9, 2016, date, and was thus clear that Fredin had begun posting about Miller on his Match.com account page more than a year before the warrant was obtained.

Fredin next challenges the statement "Fredin was also using his Facebook.com profile to post similar messages."  (McCabe Ex. N.)  Fredin contends this statement was false because his posts were public posts, not private messages.  (SAC ¶ 135.)  Again, Fredin provides no evidentiary support for his position.  Rather, he cites to an allegation in his First Amended Complaint, which is not proper evidentiary support.  He also cites

_____

[5]  The Court will assume *arguendo* that McCabe could be held liable for statements he made to the actual affiant, Detective Hall.

to an incident report authored by Sergeant McCabe on March 1, 2017 (McCabe Ex. G),
but this report does not provide support for the posts/messages discrepancy.  Finally,
Fredin references the HRO entered in the *Miller* proceeding on January 28, 2016, and
claims it did not prohibit public posts.  But the HRO did not distinguish between public
and private posts or messages.  Rather, the HRO precluded any direct or indirect contact,
including "contact via electronic means such as email or social networking sites."  (*See*
Tweeten Aff. Ex. 2 [Doc. No. 41-2].)

Fredin next challenges as false or made in reckless disregard of the truth a
statement in paragraph 8 of the affidavit that during a recent hearing in the *Miller* case,
"Ramsey County Referee Street opined that Fredin's posting about [Miller] on his social
media sites was prohibited by the harassment order."  (SAC ¶ 135; McCabe Ex. N.)
Though Fredin asserts the statement is false, he does not provide a transcript of the
hearing or other evidentiary support to substantiate his position.  One of the exhibits of
record to which he cites (Fredin Aff. Ex. 1) does not relate to this allegation; the other
exhibit is the *Miller* HRO, which does not set forth Referee Street's comments at the
hearing.

Fredin next challenges the statement "Fredin has continued to stalk and harass
[Miller] through social media, with his last known post on 04/05/2017."  (SAC ¶ 135;
McCabe Ex. N.)  Fredin contends the statement was false because the affidavit omitted
that the post was a public post, not a message, that offered a constitutionally protected
criticism of a public official.  But, as mentioned above, the *Miller* HRO did not
distinguish between public posts and private messages, nor is Miller a public official.

22

Fredin alleges that the affidavit omitted the fact that search would be performed in connection with "other pending cases."  (SAC ¶¶ 140-41, 143.)  Fredin believes the "other pending cases" were the civil HRO proceedings.  However, Sergeant McCabe's incident report of May 2, 2017, states that the warrant was obtained at the direction of the St. Paul City Attorney's office "to obtain/preserve evidence of this case, and other pending cases."  (McCabe Ex. L.)  The reference to the St. Paul City Attorney's Office would indicate that the "other pending cases" were also criminal in nature, not civil.  But in any event, Fredin has not shown the omission was done knowingly or with reckless disregard, or that if the phrase had been included probable cause would be absent.

The final omission challenged by Fredin is the omission that Sergeant McCabe intended to serve Middlecamp's HRO and Schaefer's contempt motion on Fredin at the time the search warrant was executed.  (SAC ¶ 135.)  That omission did not represent a falsity or reckless disregard of the truth because it cannot be known whether Sergeant McCabe had even formed that intention at the time the affidavit was drafted, much less whether he actually intended to serve the HRO and motion at the same time.  Moreover, the Fourth Amendment does not prohibit a police officer from serving paperwork at the same time a warrant is executed; the question is whether the execution of the search warrant was reasonable.

Lastly, with respect to the Fourth Amendment search and seizure claim against Middlecamp, the SAC does not allege that she participated in drafting the supporting affidavit or in the execution of the warrant.  The pertinent allegation is that Middlecamp had "substantive conversations" with Sergeant McCabe before the search.  This

23

allegation does not create a plausible inference that Middlecamp violated the Fourth Amendment.

Therefore, the Court recommends that summary judgment be granted in favor of Sergeant McCabe with respect to the *Franks*-based Fourth Amendment claim, and that the remainder of Count 2 of the SAC be dismissed with prejudice.

### 3.    Abuse of Process Claim

Count 3 of the SAC asserts an abuse of process claim against Middlecamp, Schaefer, Miller, and Sergeant McCabe.  Fredin contends these Defendants wrongfully instigated a criminal action, *State v. Fredin*, Case No. 62-cr-17-3156 (Ramsey Cty. Dist. Ct.), against him.  (SAC ¶¶ 146-49.)  He also alleges that Sergeant McCabe abused process in obtaining and executing the search warrant in April 2017 because Sergeant McCabe failed to disclose an ulterior purpose in obtaining the warrant.  (SAC ¶ 130.)

In Minnesota, the elements of an abuse of process claim are: "(a) the existence of an ulterior purpose, and (b) the act of using the process to accomplish a result not within the scope of the proceeding in which it was issued, whether such result might otherwise be lawfully obtained or not."  *Hoppe v. Klapperich*, 28 N.W.2d 780, 786 (Minn. 1947). The essence of the claim is the misuse of process, after the process has been issued, for an outcome other than that for which the process was issued to attain.  *Id.*  "The regularity or irregularity in the issuance of the process which has been abused is immaterial."  *Id.*  There must also be an injury either to the person or to property.  *Id.* (quoting *Nelson v. National Casualty Co.*, 228 N.W. 437, 439 (Minn. 1929)).

Fredin's abuse of process claim against Middlecamp, Schaefer, Sergeant McCabe,

and Miller based on the filing of criminal charges fails for two reasons.  First, he does not

allege an ulterior purpose.  Middlecamp, Schaefer, Sergeant McCabe, and Miller

participated in the judicial process for the purpose of charging and convicting Fredin of

the crime of stalking, *see* Minn. Stat. § 609.749, subd. 2(6), and Fredin was in fact

charged and convicted with that crime.  *See* Register of Actions, *State v. Fredin*, Case

No. 62-cr-17-3156 (Ramsey Cty. Dist. Ct.)  Second, Fredin does not allege sufficient

facts to create an inference that Middlecamp, Schaefer, Sergeant McCabe, or Miller used

the judicial process to achieve an outcome outside the scope of the proceedings.  *Accord*

*Fredin v. Middlecamp*, No. 0:17-cv-3058 (SRN/HB), 2018 WL 4616456, at *5 (D. Minn.

Sept. 26, 2018).

Fredin's abuse of process claim against Sergeant McCabe based on the search

warrant also fails.  Though Fredin has alleged an ulterior purpose, he does not allege facts

from which the Court could reasonably infer that Sergeant McCabe used the search

warrant to accomplish a result outside the scope of the warrant.  The warrant was

lawfully obtained upon a showing of probable cause, and the items seized were within the

scope of the warrant.  There is no allegation that items seized during the search were

instead given to Middlecamp or used in her HRO proceeding.  To the extent Fredin

alleges that Sergeant McCabe used the execution of the warrant as an opportunity to

serve Middlecamp's HRO motion and Schaefer's contempt motion on him, the Court is

not aware of any cases suggesting that it is an abuse of process for a police officer to take

the opportunity to execute several tasks, each legitimate, on a single visit.  Moreover,

Fredin has not alleged any facts from which the Court could infer an injury to his person

or property resulting from the service of process.

Thus, the Court recommends dismissal with prejudice of Count 3 of the SAC.

### 4.    Fraud and Negligent Misrepresentation Claim

Count 4 of the SAC asserts a "fraud and negligent misrepresentation claim" against Middlecamp, Schaefer, and Miller.  Specifically, Fredin alleges he was unlawfully arrested, charged, and detained in as a result of knowingly false statements made by these Defendants to police investigators, police officers, the St. Paul City Attorney's Office, and the Ramsey County District Court.  (SAC ¶ 152.)

> In Minnesota, the elements necessary for a fraudulent representation claim are:
>
> (1) a false representation . . . of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce [another] to act in reliance thereon; (4) that the representation caused [another] to act in reliance thereon; and (5) that [another] suffered pecuniary damages as a result of the reliance.

*Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).  The elements of a negligent misrepresentation claim are: (1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplies false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff; and (4) failure by the defendant to exercise reasonable care in communicating the information."  *Williams v. Smith*, 820 N.W.2d 807, 815 (Minn. 2012).

Fredin's fraudulent misrepresentation and negligent misrepresentation claim fails because he does not allege, nor can a reasonable inference be drawn from his allegations, that *he* relied on any of the allegedly false statements made by Miller, Schaefer, or

Middlecamp to police investigators, police officers, the St. Paul City Attorney's Office, and to the Ramsey County District Court. Consequently, this claim should be dismissed with prejudice.

### 5.    Defamation Claim

Count 5 of the SAC alleges that Middlecamp and Schaefer defamed Fredin on the @CardsAgstHrsmt Twitter account and in an article written by Michael Mullen and published in *City Pages* on February 22, 2017. (SAC ¶¶ 79, 157.) Though the SAC refers generally to "over 50 disparaging and defamatory tweets," the only specific tweet described in the SAC was tweeted by Middlecamp: "Women of MN: this is Brock Fredin, aka Dan/Will. He has at least two restraining orders against him. Please RT to help keep women safe." (SAC ¶ 126.) The only specific defamatory statement identified in the *City Pages* article is "Schaefer received unwanted phone calls and text messages that have since been proven false." (SAC ¶ 127.)

"A defamatory statement is one that tends to harm the plaintiff's reputation and lower him in the estimation of the community." *Jadwin v. Minneapolis Star & Tribune Co.*, 390 N.W.2d 437, 443 (Minn. Ct. App. 1986). In Minnesota, the elements of a defamation claim are: "(a) a false and defamatory statement about the plaintiff; (b) in unprivileged publication to a third party; (c) that harmed the plaintiff's reputation in the community." *Weinberger v. Maplewood Review*, 668 N.W.2d 667, 673 (Minn. 2003).

Defendants first argue that the alleged defamatory statements are protected by an absolute litigation privilege. This privilege applies to statements made in a judicial proceeding by a party or witness. *See Matthis v. Kennedy*, 67 N.W.2d 413, 417 (Minn.

1954).  Defendants also made this argument in a motion to dismiss filed in a related

federal case, *Fredin v. Miller*, No. 18-cv-466 (SRN/HB).  In that case, the Court found:

> While the privilege could apply to statements made in the state court HRO
> proceedings and statements made in Schaefer's affidavit submitted in
> support of the HRO, Fredin has not identified those statements as the basis
> for his defamation claim.  Rather, his defamation claim is founded on the
> alleged statements made on social media and to Mullen, to which the
> litigation privilege would have no discernible application.

*Fredin v. Miller*, No. 18-cv-0466 (SRN/HB), 2018 WL 6520574, at *4 (D. Minn. Oct. 17,

2018), *R&R adopted*, 2018 WL 6515071 (D. Minn. Dec. 11, 2018).  Thus, the Court

concluded that the litigation privilege did not apply to the specific defamatory statements

alleged in that case.  Consistent with that conclusion, the litigation privilege has no

application here to the tweet by Middlecamp.

Middlecamp also contends this claim should be dismissed because her tweet was

substantially true.  Truth is a complete defense to defamation, "and true statements,

however disparaging, are not actionable."  *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d

252, 255 (Minn. 1980).  The Court finds that the statements in the tweet at issue are true.

The man in the photograph was Fredin, and he had at least two HROs issued against him.

Fredin does not argue the contrary.

To the extent Middlecamp's request to retweet to keep women safe could be read

to imply that Fredin posed a risk to their safety, that is a matter of opinion.  A statement

of opinion is not actionable as defamation because it is protected speech under the First

Amendment.  *Hunt v. Univ. of Minn.*, 465 N.W.2d 88, 93 (Minn. Ct. App. 1991).  Four

factors are relevant to determining when a statement is a protected statement of opinion

or an actionable statement of fact: "(1) the statement's precision and specificity; (2) the statement's verifiability; (3) the social and literary context in which the statement was made; and (4) the statement's public context." *Id.* (citing *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302, 1305 (8th Cir. 1986)).  The statement "Please RT to help keep women safe" is not precise or verifiable, and it was made in the context of publicizing restraining orders for harassment that were actually issued against Fredin.  Thus, the request to retweet to "help keep women safe" is not defamatory.  On this basis, the Court recommends dismissal with prejudice of Count 5 as to Middlecamp.

Circling back to the alleged defamatory statement by Schaefer, Schaefer also raises the litigation privilege in support of her motion to dismiss.  Unlike the alleged defamatory statement by Middlecamp, however, the Court finds the litigation privilege does apply to the statement attributed to Schaeffer.  Essential to the Court's finding in *Fredin v. Miller* was that Fredin had alleged that Defendants made the defamatory statements *directly* to Michael Mullen, the *City Pages* reporter.  *Fredin*, 2018 WL 6520574, at *4 ("To the extent that Mullen obtained the statements repeated in the *City Pages* article from state court documents, the privilege could potentially apply, but Fredin alleges that Defendants made the statements directly to Mullen.").  The SAC in the present case, however, does not contain a similar allegation with regard to Schaeffer. The Court expressly left open the possibility in *Fredin v. Miller* that the litigation privilege "could apply to statements made in the state court HRO proceedings and statements made in Schaefer's affidavit submitted in support of the HRO" that Mullen used for the article.  *Id.*  Accordingly, within the constraints of the allegations made in the

SAC in this case, the Court concludes that the litigation privilege does apply to the statement "Schaefer received unwanted phone calls and text messages" made in the *City Pages* article, because there is no allegation here that Schaefer told Mullen that directly. Even more significant, there is no allegation that Schaefer made this statement at all; the statement is attributed to Mullen. Thus, given the allegations in the SAC, the only reasonable inference is that Mullen obtained that information from documents filed in connection with the HRO proceedings, triggering application of the litigation privilege. The Court therefore recommends that Count 5 also be dismissed as to Schaefer.

### 6.    Fourth and Fourteenth Amendments–Excessive Force Claim

Count 6 of the SAC alleges that Middlecamp and Sergeant McCabe violated the Fourth and Fourteenth Amendments, pursuant to § 1983, by using excessive force during the execution of the search warrant on April 28, 2017. (SAC ¶ 160.) But Fredin does not allege the use of *any* force during the execution of the warrant, nor does he allege even *de minimis* injuries. Consequently, his excessive force claim fails and Count 6 should be dismissed. *See Roberts v. Davis*, No. 4:11-cv-2007 JAR, 2013 WL 1883083, at *4 (E.D. Mo. May 6, 2013); *Coleman v. Rieck*, 253 F. Supp. 2d 1101, 1108 (D. Neb. 2003), *aff'd*, 154 F. App'x 546 (8th Cir. 2005).

### 7.    Fourth and Fourteenth Amendments–False Arrest/ Imprisonment

Count 7 of the SAC alleges that Middlecamp, Schaefer, Miller, and Sergeant McCabe violated the Fourth and Fourteenth Amendments by causing him to be detained during the execution of the search warrant on April 28, 2017, and causing him to be

arrested after a contempt hearing in the *Middlecamp* state court proceeding on January 4,
2018.  (SAC ¶¶ 164-66.)

Beginning with the brief detention on April 28, 2017, it is well-settled "that there
is no fourth amendment violation for detaining individuals not mentioned in a search
warrant if they are present at a premises while a search is being conducted." *Liggins v.
Morris*, 749 F. Supp. 967, 972 (D. Minn. 1990) (citing *Michigan v. Summers*, 452 U.S.
692 (1981)); *see Muehler v. Mena*, 544 U.S. 93, 95 (2005) (holding that the detention of
an individual in handcuffs during a search does not violate the Fourth Amendment).
Consequently, Fredin has not stated a Fourth Amendment claim for false arrest or
imprisonment.

With respect to Fredin's arrest on January 4, 2018, there are no allegations that
Schaefer, Miller, or Sergeant McCabe had anything to do with that arrest.  Consequently,
the false arrest/imprisonment claim against those Defendants should be dismissed.

As to Middlecamp, Fredin alleges that Referee Clysdale directed her bailiff to
arrest Fredin after the hearing, based on Middlecamp's statement that she had overheard
Fredin make threats against her during a conversation he had with his family after the
hearing.  (SAC ¶¶ 66, 166.)  "A private party 'is not liable for false imprisonment for
conveying information about suspected criminal activity unless that party directly
persuades or commands the police to detain the suspect.'"  *Shqeirat v. U.S. Airways
Group, Inc.*, 645 F. Supp. 2d 765, 793 (D. Minn. 2009) (quoting *Smits v. Wal-Mart
Stores, Inc.*, 525 N.W.2d 554, 558 (Minn. Ct. App. 1994)).  "Unless a person's conduct
rises to the level of instructing the police to arrest a person, no liability can be imposed."

*Smits*, 525 N.W.2d at 558.  "It is not enough . . . that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest." *El-Ghazzawy v. Berthiaume*, 708 F. Supp. 2d 874, 889 (D. Minn. 2010) (quoting Restatement (Second) of Torts § 45A (1965)), *aff'd*, 636 F.3d 452 (8th Cir. 2011).  Here, Fredin does not allege that Middlecamp directed the arrest.  He alleges that Middlecamp reported what she overheard and that Referee Clysdale directed her bailiff to arrest Fredin.  Therefore, Fredin's false arrest/imprisonment claim against Middlecamp should be dismissed.

### 8.    Conspiracy

Count 8 of the SAC alleges that all of the Defendants—Middlecamp, Schaefer, Miller, Sergeant McCabe, and Referee Clysdale—conspired to retaliate against him, commit an unlawful search and seizure, defame him, commit fraud, exercise excessive force against him, falsely arrest or imprison him, maliciously prosecute him, harass and stalk him, and commit abuse of process.  (SAC at p. 49, ¶¶ 174-75.)  "A conspiracy is a combination of persons to accomplish an unlawful purpose or a lawful purpose by unlawful means."  *Harding v. Ohio Cas. Ins. Co.*, 41 N.W.2d 818, 824 (Minn. 1950).  A civil conspiracy claim is dependent on the existence of an underlying tort or wrong. *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997) (citing *Harding*, 41 N.W.2d at 824).  Fredin has not alleged a viable underlying tort or other claim, and thus, his conspiracy claim against all Defendants should be dismissed.

### III.    Fredin's Letter of July 5, 2018

On July 5, 2018, Fredin filed a letter asking for leave to file yet another amended complaint for the purpose of adding claims based on recent state court proceedings, including a 50-year HRO obtained by Schaefer in late June.  (Pl.'s Letter at 1 [Doc. No. 89].)  To the extent that letter could be construed as another motion to amend, the Court recommends that it be denied.  Fredin has already filed two complaints, and the Court has recommended above that he be allowed to file a third complaint, which would become the SAC discussed herein.  He has had ample opportunity to amend.  The Court expressly warned Plaintiff at a hearing on June 6, 2018, that June 15, 2018 was a firm deadline by which to seek leave to amend and that the Court would almost certainly deny as untimely a motion for leave to amend filed after that date.  (*See* Ct. Mins. at 2, June 6, 2018 [Doc. No. 79].)  Moreover, Fredin's serial efforts to amend his complaint unduly prejudice Defendants and unduly burden Defendants and the Court.  Finally, Fredin's collateral attacks on the ongoing state court HRO proceedings are likely barred by *Rooker-Feldman*.


Based on the above and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Plaintiff Brock Fredin's Motion for Leave to File a Second Amended Complaint [Doc. No. 80] be **GRANTED**;

2.  The Clerk's Office be directed to file and docket on Fredin's behalf the Second Amended Complaint, currently designated as a proposed second amended

complaint [Doc. No. 80-1];

3. Plaintiff Brock Fredin's letter request for leave to file a third amended complaint [Doc. No. 89] be **DENIED**;

4. Defendant Referee Elizabeth Clysdale's Motion to Dismiss [Doc. No. 38], as applied to the now operative Second Amended Complaint, be **GRANTED**, and all claims against Referee Clysdale be **DISMISSED WITH PREJUDICE**;

5. Defendants Grace Elizabeth Miller, Catherine Marie Schaefer, and Lindsey Middlecamp's Motion to Dismiss [Doc. No. 44], as applied to the now operative Second Amended Complaint, be **GRANTED**, and all claims against these Defendants be **DISMISSED WITH PREJUDICE**; and

6. Defendant Sergeant David E. McCabe's Motion to Dismiss [Doc. No. 49], as applied to the now operative Second Amended Complaint, be **GRANTED**, as follows:

    a. Summary judgment be awarded on the search warrant-based retaliation claim in Count 1 of the SAC and on the *Franks*-based Fourth Amendment claim in Count 2 of the SAC; and

    b. All remaining claims against Sergeant McCabe be **DISMISSED WITH PREJUDICE**.

Dated: December 20, 2018

*s/ Hildy Bowbeer*

HILDY BOWBEER
United States Magistrate Judge

34

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).